UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
UNITED STATES OF AMERICA,
    Plaintiff,

v.

RAZVAN PASCU,
    Defendant
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRIMINAL ACTION
No. 11-CR-10199-DPW

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE
FROM SEARCH A MOTOR VEHICLE, AND FRUITS THEREOF**

**FACTS**

    Razvan Pascu is a Romanian citizen and Romanian is his native language. He has a basic understanding of Italian, and extremely limited understanding of English.

    At 1:59 p.m. on April 30, 2011, the Cambridge Police received a call from an Allan Maffeo who reported a "suspicious" person going in and out of the ATM of the Eastern Bank at the Fresh Pond Mall in Cambridge, and constantly going in and out of a gray 2009 Chrysler 300 automobile. Mr. Maffeo described the individual and his clothing, including that he was wearing a sweatshirt with a hood over his head each time he entered the ATM machine alcove. Officer Steven Allen responded to the area and was approached by Mr. Maffeo. Mr. Maffeo repeated his description and the person's behavior, including that this person was "messing" with the ATM machine. Mr. Maffeo also observed this individual "constantly" getting into and out of a gray 2009 Chrysler 300. He

identified the license plate (NY Lic. FHW 4206), and said that it was parked at "the other end of the parking lot" about "50-100 yards from the Eastern Bank."

Officer Allen then spotted a man fitting this description talking on a cell phone. Allen exited his cruiser and asked the man if he could speak to him. After a brief conversation in which the man spoke with a "heavy accent," Allen requested some identification. The man produced a Romanian passport and another form of identification.

At this moment, other officers arrived. The man, now identified as Razvan Pascu, admitted he was the operator of the 2009 Chrysler with New York plates. Simultaneously, officers were in the area of the ATM machines, which appeared to have been tampered with.

Mr. Pascu was then placed against a police car with his hands outstretched. He was patted down by a police officer who removed a set of keys. According to Allen, Pascu "gave myself and Officer M. Price verbal permission to inventory" the car. Mr. Pascu denies that any permission was given orally or in writing. At no time was a written consent form provided.

Police reports indicate that Mr. Pascu had a "thick accent but was understandable." Officer Allen reported that after first "speaking with [Mr. Pascu] and gathering valuable information," he read Mr. Pascu his Miranda rights.

The car was searched and a computer, a passport of another Romanian citizen, and several documents were seized. Mr. Pascu was then brought to the Cambridge Police station where he indicated he had some understanding of Italian. As a result, Officer Joseph DeSimone, who spoke Italian, was called in to assist.

After being advised of his rights in Italian, a Miranda form in Italian was produced and signed by Mr. Pascu, and an interview was held. When the interview began, Mr. Pascu gave some personal information, including the fact that he had arrived in this country less than a month before. When questioned about his activities earlier that day, he requested a lawyer and the interview was terminated. Officer DeSimone reported that:

> Pascu's mastery of the English language seemed much better than my skill with the Italian language. Through the use of English and Italian, and due [to] our personalities, we were able to communicate fairly well at times and abysmally at others … [t]he conversation was disjointed and stifled at times and was very difficult although Pascu was cooperative throughout. Eventually he unequivocally asked for an attorney … after he identified a photograph of the co-defendant captured by bank surveillance as 'un amico'.

At some point after the arrest, the car was impounded and taken to the police station. Again the vehicle was searched without the benefit of a warrant.

## ARGUMENT

### A. The Defendant had a reasonable expectation of privacy in the contents of the motor vehicle.

Prior to the arrival of the police, the Defendant was observed by Maffeo constantly going in and out of the vehicle. When first encountered by the police, the Defendant was in possession of the keys to the vehicle. Police later learned the Defendant had borrowed the car from a friend.

Clearly the Defendant had dominion and control of the car and was in lawful possession of it. As such, he had a reasonable expectation of privacy in its contents. *See, United States v. Miller*, 821 F. 2d 546 (11th Cir. 1987) (driver of car

asserting permission asserting permission of owner to use the car has standing to challenge search).

### B. The search of the motor vehicle was executed without valid consent.

If the search of the motor vehicle is to be justified at all, it can only be justified on the basis of consent. Clearly, there was no search warrant and no independent probable cause to search the vehicle. The officers had information that the Defendant had been seen going back and forth between the ATM and the vehicle, and nothing more. Since the Defendant was not under arrest at the time the vehicle was searched, it was not a justifiable warrantless search of a vehicle incident to arrest. *See, New York v. Belton*, 453 U.S. 454 (1981). Nor could the suspicion that might be said to have justified the initial stop of the Defendant support entry into and search of the vehicle. *Cf., United States v. Place*, 462 U.S. 696, 702 (1983) (*Terry* principles permit "seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course of investigation [a dog sniff], short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion"). Only consent can justify this search. Here, there was no valid consent.

> The government bears the burden of proof on the issue of consent.
>
> In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and voluntarily. *United States v. Marshall*, 348 F.3d 281, 285-86 (1st Cir. 2003). The assessment of whether consent is free and voluntary is a question of fact that requires an examination of the totality of the circumstances surrounding the relevant transaction between law-enforcement authorities and the consenting party. [*United States v.*] *Perez-Montanez*, [202 F.3d 434 (1st Cir. 2000)] at 438.

*United States v. Jones*, 523 F. 3d 31, 37 (1st Cir. 2008).

Particularly where a person subject to a stop or other encounter with the police does not speak English, the "burden is not met be merely showing acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543 (1968), and *United States v. Jones*, 475 F.2d 723 (5th Cir. 1973)." *United States v. Rodriguez*, 525 F. 2d 1313, 1316 (10th Cir. 1975).  To validly consent, the government must prove that the Defendant understood what the police were telling him and that he was able to communicate in an intelligent manner. "[P]antomime gestures [are] not sufficient to produce a consent to search." *United States v. Benitez-Arreguin*, 973 F. 2d 823, 826 (10th Cir. 1992.)

Here, the government cannot make such a showing.  The Defendant had at best a smattering of English, picked up mostly from listening to American music.  Rap lyrics are not known for utilizing the language of rights and consent. The Defendant's communication with English speakers was mostly by gesture. As Officer DeSimone reported, even with the benefit of his fractured Italian, communication with the Defendant was at times "abysmal[ ]."

Valid consent to search must be freely and voluntarily given. Understanding is a prerequisite to valid consent.  The government cannot prove valid consent in this case.

    **C.**    **The seizure of evidence from the vehicle cannot be justified as the result of an inventory search.**

It is clear from the report #5 of Steven Allen that the seizure of evidence from the vehicle, including "Moiceanus passport found in the motor vehicle Pascu was operating and in possession of and three separate pieces of paper with addresses on them," played in critical part in establishing the basis for Pascu's arrest. As a consequence of this arrest, the vehicle was transported to the

Cambridge Police station where it was subjected to an "inventory" search without a warrant.

The reports are ambiguous as to precisely what evidence was discovered or seized as a consequence of the inventory search as opposed to search of the vehicle in the parking lot. In any event, insofar as any evidence was seized as a result of the inventory search, it is evident that the validity of the inventory search rested upon the validity of the arrest, which in turn rested upon the validity of the "consent" search of the vehicle in the parking lot. If the consent search was tainted, the physical evidence seized from the car at the police station cannot survive the taint and is fruit of the poisonous tree. The arrest and consequent inventory search were possible only by the "exploitation of [the prior] illegality." *Wong Sun v. United States*, 371 U.S. 471 (1963).

WHEREFORE, for all the above reasons, the Defendant prays this Court convene an evidentiary hearing, and after hearing, allow the Defendant's Motion to Suppress Evidence.

RAZVAN PASCU,
By his attorneys,

7/20/2011
Date

/s/ Matthew H. Feinberg
Matthew H. Feinberg
BBO #161380
Matthew A. Kamholtz
BBO #257290
FEINBERG & KAMHOLTZ
125 Summer Street, 6th Floor
Boston, MA 02110
(617) 526-0700

CERTIFICATE OF SERVICE

      I hereby certify that I served a copy of Defendant's Motion through the ECF system, which was sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on the  20th day of July 2011.

                                            /s/ Matthew H. Feinberg
                                            Matthew H. Feinberg