```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA        )
                                      )
 5                                    )
                                      )
 6    vs.                             )  No. 1:11-cr-10199-DPW-1
                                      )
 7                                    )
      RAZVAN PASCU, also known as     )
 8    Razvan Anghel,                  )
                                      )
 9                    Defendant.      )

10

11    BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

12

13                    MOTION TO SUPPRESS - DAY TWO

14

15

16            John Joseph Moakley United States Courthouse
                          Courtroom No. 1
17                       One Courthouse Way
                         Boston, MA 02210
18               Wednesday, September 21, 2011
                          9:25 a.m.
19

20

21

22            Brenda K. Hancock, RMR, CRR
                      Official Court Reporter
23        John Joseph Moakley United States Courthouse
                       One Courthouse Way
24                      Boston, MA 02210
                        (617)439-3214

25
```

```
1
     APPEARANCES:
2
          UNITED STATES ATTORNEY'S OFFICE
3          By:  Scott Garland, AUSA
               Adam J. Bookbinder, AUSA
4          1 Courthouse Way
           Boston, MA 02210
5          On behalf of the United States of America.

6          FEINBERG & KAMHOLTZ
           By:  Mathew H. Feinberg, Esq.
7          125 Summer Street, 6th Floor
           Boston, MA 02110
8          On behalf of the Defendant.

9

10   ALSO PRESENT:

11        INTERPRETER:  Maria Bola-Ferriero  Language: Romanian

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    Testimony of:              Direct  Cross  Redirect  Recross

3    OFFICER MATTHEW PRICE

4      By Mr. Garland            4
       By Mr. Feinberg                  24
5
     OFFICER BRIAN O'CONNOR
6
       By Mr. Bookbinder        50
7      By Mr. Feinberg                  70

8    OFFICER MARLIN RIVERA
       By Mr. Feinberg          83              96
9      By Mr. Bookbinder               95

10   OFFICER BRIAN HUSSEY
       By Mr. Feinberg          97
11     By Mr. Bookbinder               105

12


13                        E X H I B I T S

14   No.                  Description         For ID   In Evd.
     Govt's
15
     2A thru D         Photos                          57
16   3                 Photo                           58
     4                 Photos                          61
17   5        Cambridge Police Inventory Policy        64
     6        CD of Booking                            68
18
     Defendant's
19
     4        Photo                                    81
20

21   B        Photo                          32

22


23


24


25

1          (The following proceedings were held in open court

2    before the Honorable Douglas P. Woodlock, United States

3    District Judge, United States District Court, District of

4    Massachusetts, at the John J. Moakley United States Courthouse,

5    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

6    Wednesday, September 21, 2011):

7          THE CLERK:  All rise.

8        (The Honorable Court entered the courtroom at 9:25 a.m.)

9          THE CLERK:  This Honorable Court is back in session.

10   You may be seated.

11         Would the interpreter please rise and raise your right

12   hand.

13              (Interpreter duly sworn by the Clerk)

14         THE COURT:  So, the Government's next witness.

15         MR. GARLAND:  Thank you, your Honor.  The United

16   States calls Officer Matt Price to the stand, please.

17         OFFICER MATTHEW PRICE, DULY SWORN BY THE CLERK

18         THE CLERK:  Please state and spell your full name for

19   the record.

20         THE WITNESS:  Matthew Price, M-A-T-T-H-E-W, P-R-I-C-E.

21              DIRECT EXAMINATION

22   BY MR. GARLAND:

23   Q.    Thank you.  Mr. Price, where do you work?

24   A.    I work for the Cambridge Police Department.

25   Q.    In what position?

A.    I work as a uniformed officer in the Community Relations

Unit.

Q.    What's the Community Relations Unit?

A.    It's a unit designed to work in different capacities with

the community, sort of beyond the classical law enforcement

duties.  My area is homeless outreach.

Q.    How long have you been with the Cambridge PD?

A.    Five years.

Q.    What did you do before that?

A.    I was an attorney.

Q.    For how long?

A.    I passed the Bar in '99.

Q.    What did you do as an attorney?

A.    I did appellate work, research and writing.

Q.    Do you still have your bar certification?

A.    Yes.

Q.    On April 30, 2011, around 2:00 this year, were you on

duty?

A.    Yes.

Q.    What were you doing?

A.    I was assigned to work that day, and I was doing homeless

outreach.

Q.    Did you respond to a call at Fresh Pond Mall at 176

Alewife Brook Parkway?

A.    Yes.

1    Q.    Around what time?

2    A.    2:00, 2:15, I think.

3    Q.    When you got there how many cars were there?

4    A.    Three cars, three police cruisers.

5    Q.    All marked cruisers?

6    A.    Yes.

7    Q.    So, you were about the fourth respondent?

8    A.    Yes.

9    Q.    Were the detectives there yet?

10   A.    I did see a detective there.

11   Q.    Who was there, which officers?

12   A.    There was Officer Glenn Marshall, Steve Allen, Marlin

13   Rivera and Dave Gamble.

14   Q.    Where were they?

15   A.    They were along the sidewalk in front of the stores, about

16   midway through the -- it's a strip mall, so they were about

17   halfway down.

18   Q.    All four of the officers were there?

19   A.    In that area.

20   Q.    Were they accompanying anybody?

21   A.    Yes.

22   Q.    Who?

23   A.    Mr. Pascu.

24   Q.    When you say "Mr. Pascu," can you describe him?

25   A.    He was standing near the front of one of the cruisers, and

1   in the course of talking to some of the other officers they

2   said that's who they stopped.

3   Q.   Is that somebody that you could identify?

4   A.   Yes.

5   Q.   Would you recognize that person today?

6   A.   Yes, I would.

7   Q.   Do you see that person in the courtroom?

8   A.   Yes, I do.

9   Q.   Can you point to that person and describe a particular

10   piece of clothing?

11         MR. FEINBERG:  I'll stipulate, Judge.

12         THE COURT:  All right.

13         MR. GARLAND:   Thank you.

14   BY MR. GARLAND:

15   Q.   So, who was closest to Mr. Pascu when you first got there?

16   A.   Officer Marshall was close to him, and then officers were

17   coming and going, so it changed, but I think Officer Marshall

18   was near him when I first got there.

19   Q.   When you first got there, what did you do?  Did you go

20   right to those officers?

21   A.   Yes.

22   Q.   And what did you do once you got there?

23   A.   Asked what was happening.

24   Q.   Who did you talk to?

25   A.   I talked to Glenn Marshall and Steve Allen.

1    Q.    What did they tell you?

2    A.    They said that they had stopped Mr. Pascu and that they

3    were looking for a bag.

4    Q.    Did they describe what type of bag?

5    A.    From what I understood, it was some kind of a shoulder

6    bag.  It wasn't really clear to me.

7    Q.    What did you do then?

8    A.    I stayed for a while in that area and then spent a little

9    bit of time looking for the bag.

10   Q.    Where did you look for the bag?

11   A.    Right in the vicinity of where the cruisers were.

12   Q.    Were you aware when you first got there of whether the

13   defendant had a car with him that he had driven?

14   A.    Not immediately.

15   Q.    When did you learn about the car?

16   A.    One of the other officers told me.

17   Q.    Do you recall who?

18   A.    No, I don't.

19   Q.    Did the officer indicate where the car was?

20   A.    Yes.  In the general area in the parking lot.

21   Q.    When the officer did that, did you actually see the car or

22   just see the area to which he had pointed?

23   A.    The area.

24   Q.    As you were there in the area around Mr. Pascu, did you

25   overhear any conversation with Mr. Pascu or from Mr. Pascu?

1  A.   Yes.

2  Q.   What did you overhear?

3  A.   He was trying to answer questions about why he was there,

4  what he was doing, when he had arrived, where he had come from.

5  Q.   What language was the conversation in?

6  A.   English.

7  Q.   Were you close enough to hear his responses, if any, to

8  those questions?

9  A.   Yes.

10  Q.   Did he seem to have any difficulty in understanding

11  questions put to him in English?

12  A.   He was able to answer the questions.

13  Q.   Okay.  He was able to answer.  Did he seem to have

14  difficulty in answering them?

15  A.   He seemed to have some difficulty.

16  Q.   And how did that manifest itself?

17  A.   He was slow to answer in some cases.  The English was

18  broken in some cases, but it was difficult for me to say

19  definitely because the story that he was telling wasn't

20  entirely clear, so I couldn't say for certain how much of it

21  was English and how much of it was just convoluted.

22  Q.   When you say "how much of it was English," was he

23  responding in any language other than English?

24  A.   No.  Always in English.

25  Q.   When you say that he was using broken English, what do you

1   mean?

2          MR. FEINBERG:  Your Honor, I don't know who these

3   folks are who came in.

4          THE COURT:  I think they are visitors with Judge

5   Young.  I do not think any of them are going to be witnesses,

6   at least as far as I know.

7          Judge Young, are any of those individuals likely to be

8   witnesses in this case, because we have a sequestration order?

9                      (Laughter)

10          JUDGE YOUNG:  It is highly unlikely.  They are

11   lawyers, but students in my MCLE class.  One is from the

12   Corporation Counsel's Office.

13          THE COURT:  I am assuming that that is the City of

14   Boston.  This is another country:  Cambridge.

15                      (Laughter)

16          MR. GARLAND:  Thank you, your Honor.

17          THE COURT:  You may proceed.

18   BY MR. GARLAND:

19   Q.   When you said that he was using broken English, what did

20   you mean by "broken English"?

21   A.   It was in fits and spurts.  It was not entirely

22   grammatically correct.  Things of that nature.

23   Q.   I'm sorry, I didn't mean to interrupt you.

24   A.   That's all.

25   Q.   You said that the story was unclear.  What was the story

1    and what was unclear about it?

2    A.   He said he had arrived in Cambridge that morning from New

3    York City to meet a woman he had met about ten days ago or ten

4    days prior.  He didn't know her name.  He didn't have a number,

5    phone number to reach her at.  He didn't have a definite

6    meeting place.  He only knew her first name.  That's about as

7    clear as I understood it.

8    Q.   And when you learned that story, did you learn that story

9    from the other officers or from listening to their conversation

10   with Mr. Pascu himself?

11   A.   That was from listening to their conversation.

12   Q.   And you were able to pick all of that up from Mr. Pascu

13   despite what you said was broken English before?

14   A.   Yes.

15   Q.   Did his ability to understand English or respond in

16   English appear to you to change over the course of your

17   interactions with him?

18   A.   Yes.

19   Q.   How so?

20   A.   He seemed, as time passed, to speak more and speak more

21   clearly.

22   Q.   Again, in English?

23   A.   Yes.

24   Q.   After listening to the conversation did you join in the

25   search for the shoulder bag?

1    A.    Yes.

2    Q.    And so you said you looked around in the area of the

3    cruisers at that time?

4    A.    Yes.

5    Q.    Did you find the shoulder bag?

6    A.    No.

7    Q.    Do you know if anybody else did?

8    A.    No, nobody else did.

9    Q.    What did you do after that?

10   A.    I went to the area where his car was.

11   Q.    There that had been pointed out to you before?

12   A.    Yes.

13   Q.    And what did you see when you got there?

14   A.    I saw two officers at the car.

15   Q.    Which officers?

16   A.    Officer Allen and Officer Rivera.

17   Q.    And what were they doing?

18   A.    They were looking in the car.

19   Q.    When you say "looking in the car," were they inside the

20   car or outside the car at the time?

21   A.    They were searching in the car.

22   Q.    Were the doors open?

23   A.    Yes.

24   Q.    Was the trunk open?

25   A.    No.

1    Q.   And what happened when you went over there and you saw

2    them searching the car?

3    A.   I asked them if they had asked for consent to search the

4    car from Mr. Pascu.

5    Q.   Why did you ask that?

6    A.   Pardon?

7         MR. FEINBERG:  Objection.

8    BY MR. GARLAND:

9    Q.   Why did you ask that?

10        THE COURT:  Is there an objection?

11        MR. FEINBERG:  No.  I withdraw it.  I didn't hear the

12   question properly.

13        THE COURT:  Okay.

14   A.   I asked it because I thought it was important for us to be

15   able to search the car with his consent.

16   BY MR. GARLAND:

17   Q.   During the time that you had been back with the officers

18   had you heard them ask for consent and get consent from

19   Mr. Pascu?

20   A.   No.

21   Q.   And you yourself hadn't asked for consent at that point, I

22   take it?

23   A.   Correct.

24   Q.   And had anybody told you that they had gotten consent from

25   Mr. Pascu at that point?

1    A.   No.

2    Q.   So, when you went to the car and you saw the officers --

3    and which officers was it again?

4    A.   At the car?

5    Q.   Yes.

6    A.   Officers Rivera and Allen.

7    Q.   So, it was Allen.  Did Allen go over to the car with you

8    that first time that you went there?

9    A.   No.  They were there at the car and I walked over to them

10   at the car.

11   Q.   Before I think you testified that Officer Allen had been

12   back with the suspect.  Had you seen him go over to the car?

13   A.   No.  People were coming and going, so over that course of

14   time he must have gone over to the car.

15   Q.   So, they're looking in the car.  Did they show you

16   anything that they found at that point?

17   A.   No.

18   Q.   So, what did they answer when you asked whether they had

19   gotten consent?

20   A.   They said, "No."

21   Q.   What happened next?

22            MR. FEINBERG:  I believe the answer was "No"?

23            THE COURT:  "No."  Or at least I heard "No."

24            Go ahead.

25   BY MR. GARLAND:

1    Q.    What happened next?

2    A.    I said they should shut the car doors and leave the car

3    alone for now.

4    Q.    Did they do that?

5    A.    Yes.

6    Q.    What happened after that, after they shut the car up?

7    A.    We went back to the area where Mr. Pascu was and people

8    were still looking for the shoulder bag.  I asked him for

9    consent to search the car.

10   Q.    When you went over to ask for consent, had you or either

11   of the other officers taken anything from the car and brought

12   it over to Mr. Pascu?

13   A.    No.

14   Q.    When you asked Mr. Pascu for consent, can you recall to

15   the best of your recollection what specific words did you use?

16   A.    I don't remember the specific words, but it was, Can we

17   have consent to search your car?

18   Q.    Did he appear to have any difficulty in understanding you?

19   A.    No.

20   Q.    What did he respond with?

21   A.    "Yes."

22   Q.    Did he respond verbally or just with a nod of the head?

23   A.    He said, "Yes."

24   Q.    In English?

25   A.    Yes.

1  Q.   Did you have any difficulty understanding him?

2  A.   No.

3  Q.   What did you do after you got consent from Mr. Pascu?

4  A.   I went with Officer Allen back to the car and we searched

5  the car.

6  Q.   Which areas of the car did you search?

7  A.   I searched the front passenger side.

8  Q.   Did you find anything there?

9  A.   I found like a small change purse and a few other things

10  that I don't specifically remember what they were.

11  Q.   When you say "the front passenger side" of the car, did

12  you open the glove compartment, for example, during this search

13  of the car?

14  A.   No, I did not.

15  Q.   And what were you looking for when you searched?

16  A.   A shoulder bag.

17  Q.   You were looking only for the shoulder bag at that time?

18  A.   Yes.

19  Q.   Did Officer Allen then participate in the search also?

20  A.   Yes.

21  Q.   Where was he looking?

22  A.   He was on the driver's side of the car.

23  Q.   Did you know what he was looking for?

24  A.   I presume a shoulder bag.

25  Q.   How long did that search last?

1    A.    A couple of minutes.

2    Q.    Did either you or Officer Allen go into the trunk during

3    that search?

4    A.    No.

5    Q.    Did you guys find a bag of any sort?

6    A.    No.  Just the change purse.

7    Q.    Did you take the change purse out of the car at that

8    point?

9    A.    No.

10   Q.    What did you do after that search of the car?

11   A.    We closed up the car again, went back to the area where

12   Mr. Pascu was, and I asked if anybody had called the detectives

13   to come down.

14   Q.    Why did you ask that?

15   A.    I thought it would be helpful in terms of the

16   investigation.

17   Q.    What was the answer?

18   A.    No, nobody had called.

19   Q.    So, despite nobody having been called, were there any

20   detectives there at that time?

21   A.    At that time, no.

22   Q.    So, it was all officers?

23   A.    Yes.

24   Q.    What happened after that?

25   A.    I got on the radio, called the detectives, and they said

1    they would come to where we were.

2    Q.   How long afterwards did the detectives arrive?

3    A.   I don't know.

4    Q.   After you called the detectives and asked them to come,

5    what did you do?

6    A.   Waited.

7    Q.   What happened while you were waiting, anything in

8    particular as far as Mr. Pascu in terms of conversation or

9    anything else?

10   A.   No.  The conversation was pretty much how I described it

11   before.

12   Q.   So, the conversation continued but along the lines that

13   you discussed before; is that correct?

14   A.   Yes.

15   Q.   And that was held in English as well; is that correct?

16   A.   Yes.

17   Q.   So, during that period of time was there a pat frisk or

18   reading of Miranda rights to the defendant?

19   A.   I don't know if there was a pat frisk.  I think that Glenn

20   Marshall read him his rights while we were waiting.

21   Q.   Did Mr. Pascu appear to have any difficulty in

22   understanding those rights as read to him?

23   A.   No.

24   Q.   Did he make any response to having been read his rights?

25   A.   I don't remember, to be honest.

1    Q.   During this period was Mr. Pascu in cuffs at all?

2    A.   No.

3    Q.   Were any of the officers' weapons drawn?

4    A.   No.

5    Q.   Did any of the officers, had they seated him in a cruiser?

6    A.   Had they seated him in a cruiser?

7    Q.   Yes.

8    A.   No.

9    Q.   Did they have hands on him restraining him?

10   A.   No.

11   Q.   And that goes back to the same questions as to the earlier

12   conversation that you had witnessed with him.  During that

13   period were any of those things true?

14   A.   No.

15   Q.   At some point did you ask Mr. Pascu for consent to search

16   the car again?

17   A.   Yes.

18   Q.   Was that before or after his having been read the Miranda

19   rights?

20   A.   After.

21   Q.   Was that before or after when the detectives arrived?

22   A.   I'm sorry.  Repeat the question.

23   Q.   Did you ask for consent to search the car again before or

24   after the detectives arrived?

25   A.   After the detectives arrived.

1   Q.   Why did you ask for consent a second time?

2   A.   Actually, it was Officer Allen that asked the second time.

3   Q.   Do you recall any better the specific words that he used

4   to ask for consent?

5   A.   No.  He asked if we could have consent to search his car.

6   Q.   And was there a response by Mr. Pascu?

7   A.   Yes.

8   Q.   What did he respond?

9   A.   "Yes."

10  Q.   And, again, did he respond verbally or with gestures?

11  A.   Verbally.

12  Q.   What did you and Officer Allen do after getting consent

13  the second time to search the car?

14  A.   We went back to the car.

15  Q.   Did you search it?

16  A.   Yes.

17  Q.   When you got to the car were the doors open, was the trunk

18  unlocked?

19  A.   No.  We opened the car.

20  Q.   What were you looking for at this point?

21  A.   We had a better understanding -- I don't know if we had a

22  better understanding, but we were looking for something that

23  might be like a device, a device that could be used on an ATM.

24  Q.   What type of device are you thinking of?

25  A.   It would be I guess what's called a skimming device.

1   Q.   And how did you divide up the car this time to search it?

2   A.   I went back to the passenger side.

3   Q.   And where was Officer Allen searching?

4   A.   On the driver's side.

5   Q.   And, again, did either of you go into the trunk at that

6   point?

7   A.   No.

8   Q.   What did the two of you find during that search of the

9   car?

10  A.   During that search of the car, in the glove compartment I

11  found a Romanian passport, and I found several slips of paper

12  with handwriting on it similar to what I had seen Detective

13  O'Connor with after they had arrived and begun their part of

14  the investigation.

15  Q.   Okay.  So, if I can get the chronology right, then, this

16  occurs after the detectives have arrived, this second search

17  that you participated in; is that correct?

18  A.   Correct.

19  Q.   And you had seen Detective O'Connor with certain pieces of

20  paper?

21  A.   Yes.

22  Q.   Do you know where Detective O'Connor had gotten those

23  pieces of papers?

24  A.   No.

25  Q.   And do you know what was on those pieces of papers?

1   A.   Addresses.

2   Q.   Did you know at the time where those addresses belonged

3   to?

4   A.   A couple were from New York.

5   Q.   From New York, you said?

6   A.   Yes.

7   Q.   And so the pieces of paper that you now found in the car

8   during the second search that you participated in, what was on

9   those pieces of paper?

10  A.   Addresses.

11  Q.   The passport that you found, who did it belong to, or what

12  was the name on it?

13  A.   I don't remember the name and couldn't pronounce it when I

14  found it, but it did not belong to Mr. Pascu.

15  Q.   Do you recall what nationality the passport was issued

16  from?

17  A.   It was Romanian.

18  Q.   Did you find the shoulder bag during that search?

19  A.   No.

20  Q.   Did Officer Allen?

21  A.   No.

22  Q.   Did either of you find sunglasses during that search?

23  A.   No.

24  Q.   Did either of you find a computer during that search?

25  A.   No.

```
1    Q.   Did either of you -- I think maybe I asked this before,

2    but did you go into the trunk during that search?

3    A.   No.

4    Q.   Did you take anything from the car after that search?

5    A.   I took the pieces of paper and the passport.

6    Q.   What did you do with them?

7    A.   I walked back to where the bank entrance was.  At that

8    time the detectives were inside the bank.

9    Q.   And who did you give them to?

10   A.   Detective David Atherton.

11   Q.   And what happened next?

12   A.   He told me that the picture in the passport was the same

13   person that they had viewed on the videotapes from the bank,

14   from inside the bank.

15   Q.   And then what happened?

16   A.   We waited.

17   Q.   Who were you waiting for?

18   A.   At that time we were waiting for a Secret Service Agent to

19   respond.

20   Q.   Did the Secret Service Agent come to the scene?

21   A.   Yes.

22   Q.   What did that Secret Service Agent do when he got there?

23   A.   He asked what was happening, what information we had as

24   far as what was going on.

25   Q.   And then what did he do?
```

1  A.   He examined the ATM.

2  Q.   Did he find anything out of the ordinary?

3  A.   He found a device attached to the ATM.

4  Q.   What sort of devices did he find?

5  A.   He found a device that he explained was used for skimming

6  ATM cards and a device with a small camera in it to capture

7  PINS, when people typed their PINS into the keyboard.

8  Q.   Can you describe for the Court, during the period that you

9  were with Mr. Pascu or you observed him, what was his demeanor?

10 A.   Nervous, reserved.

11 Q.   And by "reserved," what do you mean?

12 A.   He wasn't calm.  My impression was he was hoping that this

13 would pass and he would be able to leave.

14         MR. FEINBERG:  Objection.  Move to strike.

15         THE COURT:  No.  I will permit it.

16         MR. GARLAND:  I think I am about done.  May I confer

17 with counsel?

18         THE COURT:  Yes.

19         MR. GARLAND:  Thank you.

20              (Counsel conferred off the record)

21         MR. GARLAND:  That's all I have, your Honor.

22         THE COURT:  All right.

23         Mr. Feinberg.

24         MR. FEINBERG:  Thank you, Judge.

25                          CROSS-EXAMINATION

BY MR. FEINBERG:

Q.   Good morning, Officer Price.

A.   Good morning.

Q.   You say you arrived between about 2:00 and 2:15; is that correct?

A.   Yes.

Q.   And when you arrived you were the fourth cruiser?

A.   Yes.  I drove the wagon, but, yes.

Q.   It was a wagon?

A.   Yes.

Q.   And were you in uniform?

A.   Yes.

Q.   And you were armed?  You had a gun on you --

A.   Yes.

Q.   -- as part of your uniform?

A.   Yes.

Q.   Same thing with the other officers who were there?

A.   Yes.

Q.   And when you arrived did you pull up your wagon to approximately where the defendant was located, Mr. Pascu?

A.   I parked behind the last cruiser.

Q.   Okay.  The cruisers were parked in a row in the street so-called or the two-lane road in front of the sidewalk; is that correct?

A.   Correct.

1    Q.   And you approached the group.  They were standing

2    together, four other officers and Mr. Pascu; is that correct?

3    A.   Yeah.  When I first arrived they weren't all together.

4    Q.   When you say "they weren't all together," can you tell us

5    where they were?

6    A.   Glenn Marshall was there with Mr. Pascu, and other

7    officers were not in that immediate area.

8    Q.   So, when you first arrived you only saw Officer Marshall

9    with Mr. Pascu?

10   A.   He was standing the closest to Mr. Pascu.

11   Q.   Do you remember whether or not Officer Allen was in close

12   proximity?

13   A.   He was in the area.

14   Q.   Well, when you say "in the area," do you mean in the

15   parking lot area?  Approximately how far in distance away from

16   where Mr. Pascu was located?

17   A.   Within talking distance.

18   Q.   Five or ten feet?  I'm in talking distance of you.  That's

19   a fair distance.  I'm just trying to get a sense of it.

20   A.   Yeah, it could have been within this distance.

21   Q.   And do you know what Officer Allen was doing?

22   A.   I did not know immediately what he was doing.

23   Q.   As far as you could tell, who was having the conversation

24   with Mr. Pascu when you first arrived?

25   A.   Officer Marshall.

1    Q.   And you didn't see Officer Allen having a conversation?

2    A.   No.

3    Q.   At all?

4    A.   Not immediately when I arrived.

5    Q.   And at any time did you see a conversation just with

6    Officer Allen and Mr. Pascu?

7    A.   Just the two of them?

8    Q.   Correct.

9    A.   Alone?

10   Q.   Well, not necessarily alone but having a one-on-one

11   conversation in the presence of others.

12   A.   Not at that time.

13   Q.   When you arrived did you then go approach Officer Marshall

14   and speak to him?

15   A.   Yes.

16   Q.   And he gave you sort of a background of what was going on;

17   is that correct?

18   A.   Yes.

19   Q.   Now, did you see other officers searching the general area

20   at that time?

21   A.   Yes.

22   Q.   Who was searching the general area?

23   A.   Marlin Rivera and Dave Gamble.

24   Q.   When you arrived was Mr. Pascu standing?

25   A.   Yes.

1   Q.   Did you at any time see him with arms and legs spread on a

2   police cruiser?

3   A.   No.

4   Q.   So, you have no memory of ever seeing a pat-down?

5   A.   At one point he was patted down, but that was -- I

6   remember that being later.

7   Q.   Well after the second search?

8   A.   I don't know.

9   Q.   Well, was it after the first search?  Let me break this

10  down.  Was it after the first time you went to the car?

11  A.   It was after the detectives arrived, so, yes, it was after

12  the first time we went to the car.

13  Q.   In fact, as I understand the sequence of events, the

14  detectives didn't arrive until you had gone to the car once,

15  seen Officer Rivera at the car, had the conversation in which

16  they told you they didn't have consent, correct?

17  A.   Yes.

18  Q.   And then you go back to where Mr. Pascu is, you asked him

19  for consent, correct?

20  A.   Yes.

21  Q.   He gives it to you, correct?

22  A.   Yes.

23  Q.   You go back to the car with Officer Allen?

24  A.   Yes.

25  Q.   Then you come back again a second time, and it's only at

1    that point that the detectives arrive, am I correct?

2    A.    Yes.

3    Q.    It is at that point, approximately, you say that the pat

4    frisk happened?

5    A.    Yes.

6    Q.    At any time did you see any materials that would be

7    personal, such as a wallet, cell phone and the like on the hood

8    or trunk of the car, of a police cruiser?

9    A.    Yes.

10   Q.    After the pat frisk?

11   A.    I saw them on the cruiser after the pat frisk.

12   Q.    You didn't see them before then?

13   A.    I did see them before then.

14   Q.    You did see them before then?

15   A.    Yes.

16   Q.    When did you see them, when you first arrived?

17   A.    Yes.

18   Q.    So, when you first arrived what did you see on the hood of

19   the car?

20   A.    I saw a passport, a hat, and a set of keys.

21   Q.    And the set of keys, were they sitting on the trunk?

22   A.    The hood of the car.

23   Q.    Hood of the car.  Do you remember seeing somebody take the

24   keys?

25   A.    No.

1   Q.   You say at some point you learned about the car.  Who told

2   you about the car?

3   A.   Officer Marshall.

4   Q.   This was during the same period of time when you were

5   standing with Officer Marshall, other police officers are in

6   the general vicinity, but you haven't left yet?

7   A.   Correct.

8   Q.   And at that point you see the keys on the car -- I'm

9   sorry -- you see the keys on the trunk or the hood of the car?

10  A.   I don't remember.

11  Q.   When Officer Marshall told you that there was a car

12  involved, did you ask him where it was?

13  A.   He told me where it was.

14  Q.   He pointed in a general --

15  A.   Yes.

16  Q.   He pointed in a general direction.  It's a big parking

17  lot.

18  A.   Yes.

19  Q.   We have seen pictures of it; we know what it looks like.

20  And you walked over to the car alone; is that correct?

21  A.   Yes.

22  Q.   And when you walked over to the car alone, who did you

23  see?

24  A.   I saw Officer Allen and Officer Rivera.

25  Q.   And the car was open?

1    A.    Yes.

2    Q.    And did you see the keys in Officer Allen's hand?

3    A.    No.

4    Q.    Did you see the keys in Officer Rivera's hand?

5    A.    No.

6    Q.    Did you ask them how they got into the car?

7    A.    No.

8    Q.    Did you ask them whether it was locked or not?

9    A.    No.

10   Q.    And your conversation with him was right away you said,

11   "Do you guys have consent to search this car"?

12   A.    Yes.

13   Q.    And they said, "No"?

14   A.    Yes.

15   Q.    Now, did they lock the car?  You said that you went back

16   to see Mr. Pascu at that point; is that correct?

17   A.    Yes.

18   Q.    And did you tell them to lock up?

19   A.    They closed the car.

20   Q.    You don't remember whether they did it with keys?

21   A.    No.

22   Q.    And you never saw keys?  I should put it a different way.

23   At any point in that first time that you went to the area of

24   the car, did you see anyone with a set of car keys?

25   A.    No.

1    Q.   I'm showing you a photograph that appears to be a set of

2    keys.  Does that look familiar to you as the set of keys that

3    you eventually saw on the hood of the car of the cruiser?

4    A.   No.

5    Q.   You are saying that photograph does not represent those

6    keys?

7    A.   Correct.

8    Q.   Thank you.  Can you describe what those keys looked like

9    when you did see them?

10            THE COURT:  Just so the record is clear, I assume

11   there is going to be further inquiry with respect to that

12   photograph.  Is it premarked?

13            MR. FEINBERG:  It has not been, Judge.  I can mark it

14   for identification.

15            THE COURT:  We will mark it B For Identification.

16            MR. FEINBERG:  All right.  Can we do that?

17            THE COURT:  Yes, afterwards.

18            (Defendant's Exhibit B marked for identification)

19   BY MR. FEINBERG:

20   Q.   Can you describe the keys?

21   A.   What I remember is, it had an automated locking system.

22   Q.   It had a remote device on it; is that what you're saying?

23   A.   Yes.

24   Q.   And when you saw that set of keys, that's when they were

25   on the hood of cruiser?

1  A.   Yes.

2  Q.   But that was after the pat frisk; is that correct?

3  A.   No.

4  Q.   When in the sequence of these events, Officer Price, did

5  you see the keys for the first time?

6  A.   After the first search.

7  Q.   So, at some point did you see an officer take the keys and

8  put them on the hood of the car?

9  A.   No.

10  Q.   You just saw them appear on the hood of the car; they were

11  there?

12  A.   Yes.

13  Q.   Now, you then went back to the location where Mr. Pascu

14  was; is that correct?

15  A.   At which point?

16  Q.   I'm sorry.  You are over at the car with two other

17  officers, Rivera and Allen, and you tell them to close up the

18  car because they haven't gotten consent; is that correct?

19  A.   Yes.

20  Q.   As far as you know, you don't know whether they've taken

21  anything out of the car or not.

22  A.   I didn't see them with anything.

23  Q.   You then, all three of you, go back to where Mr. Pascu is?

24  A.   Back to that area of the mall, yes.

25  Q.   And it's at that point that you say to Mr. Pascu, Could we

1   have permission to search your car?

2   A.   Yes.

3   Q.   Now, when you said those words or words like that, was

4   there any hesitation or gesture that you used -- strike the

5   word "hesitation --" was there any gesture that you used?

6   A.   No.

7   Q.   Did you use the word "permission"?

8   A.   I don't know exactly what I said, but I asked for consent

9   to search the car.

10   Q.   You used the word "consent"?

11   A.   "Consent" or "permission."  I don't remember the exact

12   word.

13   Q.   And you knew at that point that he had some difficulty

14   with English; he had a heavy accent.

15   A.   He did have an accent.

16   Q.   And you saw that gestures were being used by Officer

17   Marshall and others when talking to him, am I correct?

18   A.   Yes.

19   Q.   And you also heard him use what I would call universal

20   words, am I correct?

21   A.   I don't know what you mean.

22   Q.   Well, for example, did you hear Officer Marshall say to

23   him, do you have identification or a passport?

24   A.   I did not hear that.

25   Q.   Did you hear the word "passport" being used?

1    A.   I was told he had a passport.

2    Q.   So, by the time you got there the passport had already

3    been turned over?

4    A.   Yes.

5    Q.   Did he speak in complete sentences when you overheard the

6    conversation between Officer Marshall and him?

7    A.   He spoke in broken English, so in that sense I would say

8    they were not complete sentences.

9    Q.   And when questions were asked of him generally, wasn't it

10   the case that often he would say, "Yes," and the answer "Yes"

11   didn't mean much because it didn't relate to the question?

12   A.   I can't say that's correct.

13   Q.   Did he ever do that?  For example, did you ever hear the

14   police officers or Officer Marshall or any other police officer

15   say, Where did you come from, and his answer was, Yes?  I am

16   giving that as an example of not really understanding the

17   question but answering by saying, Yes?

18   A.   No, I don't think that's correct.

19   Q.   That didn't happen in your presence?

20   A.   Correct.

21   Q.   Now, when you talked to him about permission to search the

22   car, did you tell him that police officers had already gotten

23   his keys and had already opened his car?

24   A.   No.

25   Q.   You were aware of the fact that that had happened, am I

1    correct?

2    A.   I was aware that the officers had been searching his car.

3    Q.   Did you infer from that that they must have the keys?

4    A.   No, I did not infer that.

5    Q.   Did you ask them whether they had the keys?

6    A.   No.

7    Q.   When you asked permission from Mr. Pascu to search the

8    car, did you ask *him* for the keys?

9    A.   No.

10   Q.   Did you yourself or some other officer take the keys off

11   the hood of the cruiser at that point?

12   A.   Yes.

13   Q.   So, you saw the keys on the hood of the cruiser, correct?

14   A.   Yes.

15   Q.   And after you say you got permission from Mr. Pascu to

16   search, did you take the keys off the hood of the cruiser?

17   A.   No.

18   Q.   Who did?

19   A.   Officer Allen.

20   Q.   And did you then accompany Officer Allen back to the car?

21   A.   Yes.

22   Q.   When you accompanied him back to the car did he open the

23   car?  Did he use the remote or a key to open the car?

24   A.   I don't remember.

25   Q.   Well, do you remember whether or not the car was open?

1   A.   The doors were closed.  I remember opening the door.

2   Q.   And do you remember whether or not the car was locked?

3   A.   I do not remember if the car was locked.

4   Q.   Would it refresh your recollection if I told you that

5   Officer Allen testified that he used the remote to open the

6   car?

7   A.   I don't remember if he used the remote to open the car or

8   not.

9   Q.   Now, that first time that you went in to search the car,

10  you say that you personally went in to search the car, you say

11  that you found some stuff in the front seat, a change purse and

12  other things.

13  A.   Yes.

14  Q.   What were the other things?

15  A.   Well, I don't remember.  That's why I said "other things."

16  Q.   Okay.  But you left them there?

17  A.   Yes.

18  Q.   And you didn't open the glove compartment?

19  A.   Correct.

20  Q.   And you didn't open the trunk?

21  A.   Correct.

22  Q.   And neither did Officer Allen?

23  A.   Correct.

24  Q.   Did you have a conversation with Officer Allen while you

25  were searching the car?

1    A.    Yes.

2    Q.    And what was the conversation?

3    A.    I spoke about what I had found on the passenger seat of

4    the car.

5    Q.    Meaning the change purse?

6    A.    Yes.

7    Q.    Anything else?

8    A.    No, not that I recall.

9    Q.    And you were just looking for a shoulder bag; is that

10   correct?

11   A.    Yes.

12   Q.    And you didn't find it?

13   A.    Correct.

14   Q.    And at that point you closed the car up.  Did you lock it

15   again?  I'm sorry.  Did you lock it?

16   A.    I did not lock it.

17   Q.    Do you know whether Officer Allen locked it?

18   A.    I don't know.

19   Q.    And you then went back to the location where Mr. Pascu was

20   again?

21   A.    Yes.

22   Q.    And it's at that point that you asked if anyone had called

23   detectives; is that correct?

24   A.    Yes.

25   Q.    And they said, "No"?

1    A.    Correct.

2    Q.    Were there any other officers on the scene by this time

3    that you haven't mentioned already?

4    A.    No.

5    Q.    Do you remember an Officer Hussey?

6    A.    No, I did not see him there.

7    Q.    You know who he is, or you knew who he was at the time?

8    A.    Yes.

9    Q.    Did you remember seeing Officer Kevin Donofrio?

10   A.    Yes.

11   Q.    And when did he arrive?  I don't mean the time, but in

12   sequence when did you first see him?

13   A.    When I first got there and spoke with Officer Marshall I

14   saw Detective Donofrio.

15   Q.    So, in addition to Marshall, Gamble, Rivera and Allen,

16   when you first arrived did you see Donofrio when you first

17   arrived?

18   A.    Yes.

19   Q.    So, he was there ahead of you?

20   A.    Yes.

21   Q.    Any other officers there ahead of you that you haven't

22   mentioned so far?

23   A.    No.

24   Q.    Do you know whether or not Officer Donofrio had a partner

25   that day?

1   A.   No, I don't know.

2   Q.   Would it refresh your memory if I told you that Officer

3   Hussey was his partner?

4   A.   I didn't know who his partner was that day.

5   Q.   And what kind of a police officer is Officer Donofrio?

6   A.   He works in the Narcotics Unit.

7   Q.   And what does Officer Hussey do?

8   A.   He also works in the Narcotics Unit.

9   Q.   Now, back to the time when you asked about calling the

10   detectives, how long a period of time had elapsed from the time

11   you arrived you say somewhere between 2:00 and 2:15 and the

12   time you asked that the detectives be called?

13   A.   Specifically, I don't know.

14   Q.   Do you have a rough -- what's your best memory?

15   A.   Half an hour to an hour.

16   Q.   Fair to say, then, that the detectives didn't arrive until

17   sometime, let's say, quarter of 3:00 to 3:00?  Would that be a

18   fair estimate?

19   A.   Yes.

20   Q.   In fact, how long did it take between the time the

21   officers and the detectives were called and the time they

22   arrived?

23   A.   Twenty minutes.

24   Q.   So, from the time you arrived, sometime between 2:00 and

25   2:15, another half an hour -- Did you say half an hour to an

1   hour elapsed before you -- Your testimony is approximately

2   that's the time frame that you were there before the detectives

3   were called, correct?

4   A.   Yes.

5   Q.   And another 20 minutes or so before they actually arrived?

6   A.   Yes.

7   Q.   So, would it be fair to say that your best estimate is

8   that the detectives didn't arrive till well after 3:00?

9   A.   No.

10   Q.   3:00?  I'm just trying to calculate the time.

11   A.   I don't know.

12   Q.   Would you be comfortable with what I said before, between

13   quarter of and 3:00?  That's a little shorter than what you

14   testified to.

15   A.   I couldn't say for certain.

16   Q.   When you were standing there after coming back and telling

17   the officers that they should call the detectives, who was

18   present with Mr. Pascu besides yourself?

19   A.   I'm sorry.  Can you say that again?

20   Q.   You come back from let's call it the first search, where

21   there's no consent, where you find out that there's no consent,

22   correct?

23   A.   Yes.

24   Q.   You come back to the presence of Mr. Pascu, you're in the

25   presence of other officers, and you talk about calling the

1    detectives, correct?

2    A.    I asked Officer Marshall if anyone had called the

3    detectives.

4    Q.    And he said, "No"?

5    A.    Correct.

6    Q.    And then you understood that somebody called the

7    detectives?

8    A.    I called the detectives.

9    Q.    You called them.  And then you waited?

10   A.    Yes.

11   Q.    And when you were waiting, who was waiting with you, that

12   is to say, in the vicinity of Mr. Pascu?

13   A.    I don't specifically remember who was in the area.

14   Q.    Do you know who was in the presence of Mr. Pascu beside

15   yourself?

16   A.    The officers that were there were in the area.

17   Q.    Okay.  The same ones that you've already mentioned?

18   A.    Yes.

19   Q.    When you say "in the area," within a radius of, say, 50

20   feet from where Mr. Pascu was?

21   A.    I don't know.  I don't know 50 feet.

22   Q.    Well, do you remember anybody standing with Mr. Pascu?

23   A.    I didn't know who was standing with him at that time.

24   Q.    But he was standing?

25   A.    He was standing.

1    Q.   He didn't kneel at all?

2    A.   No.

3    Q.   And he didn't have his hands on the car at all, on the

4    cruiser?

5    A.   No.

6    Q.   At some point you say that detectives did arrive?

7    A.   Yes.

8    Q.   And you're still standing there waiting for them until

9    they arrive, am I correct?

10   A.   Yes.

11   Q.   In the presence of Mr. Pascu?

12   A.   Yes.

13   Q.   And you never saw a pat frisk?

14   A.   Before --

15   Q.   I'm sorry.  Let me try that again.  You say you don't know

16   whether or not there was a pat-down; isn't that what your

17   testimony was?

18   A.   There wasn't a pat frisk that I knew of until the

19   detectives came.

20   Q.   Okay.  And at that point was there a pat down?

21   A.   Yes.

22   Q.   And as far as you knew, that was the first time?

23   A.   Yes.

24   Q.   And did you observe that pat-down?

25   A.   Yes.

1    Q.   And that pat-down was conducted by having Mr. Pascu put

2    his hands on the trunk of the cruiser with his legs spread?

3    A.   No.  I remember that he was patted down but not with his

4    hands on the car.

5    Q.   He was just standing there patted down?

6    A.   Yes.

7    Q.   And was anything taken from his person when he was patted

8    down that you saw?

9    A.   Not that I saw.

10   Q.   And then Officer Marshall read him his rights in your

11   presence?

12   A.   He read him his rights in my presence, yeah.

13   Q.   And then you were there when Officer Allen again asked

14   consent to search; is that correct?

15   A.   Yes.

16   Q.   Was there any conversation among the police officers

17   leading up to that second request?

18   A.   Not with me.

19   Q.   Did you hear any conversation?

20   A.   In regards to?

21   Q.   In regards to any conversation just prior to Officer Allen

22   asking again for consent to search.

23   A.   No, I don't remember.

24   Q.   Now, when Officer Allen asked consent to search, do you

25   know who had the keys to the car?

1   A.   No.

2   Q.   Were the keys to the car on the hood of the cruiser?

3   A.   Yes, they could have been on the hood of the car.

4   Q.   I didn't ask whether they could have been.  I'm asking you

5   whether you remember that at the time of the second search

6   request that the keys to the car were or were not on the

7   cruiser.

8   A.   When we went to search the car the second time Officer

9   Allen had the keys.

10  Q.   Okay.  You don't know how he got the keys?

11  A.   Correct.

12  Q.   And he had the keys the first time you went over to the

13  car.  I'm sorry.  You don't know whether he had the keys the

14  first time he went over to the car; is that correct?

15  A.   Correct.

16  Q.   You don't even know whether the car was open the first

17  time.

18  A.   The first time --

19  Q.   When you first went over when there was no consent.

20  A.   Right.  I don't know.

21  Q.   Now, when you went over to the car the second time you

22  went with Officer Allen, who had the keys, correct?

23  A.   Yes.

24  Q.   And you went into the glove compartment, and that's when

25  you found this passport of this other fellow?

1   A.   Yes.

2   Q.   And at the same time you also found some pieces of paper

3   with addresses on it in there?

4   A.   Yes.

5   Q.   Was it in plain view or was it in the glove compartment?

6   A.   They were both in the glove compartment.

7   Q.   The pieces of paper?

8   A.   Yes.

9   Q.   How many pieces of paper?

10   A.   Three or four.

11   Q.   And those three or four pieces of paper had handwritten

12   addresses on them; is that correct?

13   A.   What I looked at were handwritten addresses.

14   Q.   And they were addresses in Massachusetts and Connecticut,

15   am I correct?

16   A.   That I couldn't say.  I looked, saw that they were

17   addresses.

18   Q.   And you took them?

19   A.   Yes.

20   Q.   And you brought them back to Officer Atherton, am I

21   correct?

22   A.   Yes.

23   Q.   Now, the reason you took them was because you had seen

24   Officer O'Connor, Detective O'Connor, with similar pieces of

25   paper, am I correct?

1    A.    Yes.

2    Q.    So, by the time you went back to the car for the second

3    time, Officer O'Connor had arrived, am I correct?

4    A.    Yes.

5    Q.    And he had slips of paper in his hands, am I correct?

6    A.    I saw him with one slip of paper.

7    Q.    And was it a slip of paper that had addresses on it?

8    A.    Yes.

9    Q.    Handwritten?

10   A.    Yes.

11   Q.    And do you know where Officer O'Connor got that slip of

12   paper with the handwritten addresses on it?

13   A.    No.

14   Q.    Did you talk to anybody about receiving that handwritten

15   slip of paper from anywhere, where it came from?

16   A.    No.

17   Q.    All you knew at that point is that you found these slips

18   of paper with addresses on them in the glove compartment, and

19   by then you knew that Officer O'Connor had in his possession

20   similar slips of paper, am I correct?

21   A.    Yes.

22   Q.    And were they similar in the sense that they were the same

23   size paper?

24   A.    Yes.

25   Q.    And they were the same kind of handwriting?

1    A.   Yes.

2    Q.   And therefore you decided, you believed that they were

3    important or at least important to bring Detective O'Connor's

4    attention?

5    A.   Yes.

6            MR. FEINBERG:  May I have a moment, your Honor?

7            THE COURT:  Yes.

8                              (Pause)

9    BY MR. FEINBERG:

10   Q.   What you actually saw prior to the time that you went over

11   there to the second search was Officer O'Connor with the slip

12   of paper using a laptop to compare addresses where ATM machines

13   were with the piece of paper, am I correct?

14   A.   I saw him entering the addresses from the slip of paper

15   into the laptop.

16   Q.   And where was he located when he was doing that?

17   A.   Where was he located?

18   Q.   Yes.

19   A.   He was at the trunk of the detective's car.

20   Q.   The laptop is sitting on the trunk?

21   A.   Yes.

22   Q.   At any time did you see anyone else in and around the car

23   other than Officer Rivera and Officer Allen beside yourself?

24   A.   At any point?

25   Q.   Yes.

1   A.   No.  I saw Officer Allen and Officer Rivera in the area of

2   the car.

3   Q.   And inside the car as well?

4   A.   Inside the car, yes.

5   Q.   But you didn't see Officer Hussey or Donofrio or anyone

6   else even in the vicinity of the car?

7   A.   No.  The only time that I saw Detective Donofrio was on

8   the far side of the parking lot.  That's as close as I could

9   say he was to the car.

10  Q.   Was he in a cruiser at the time?  What was he doing in the

11  far side of the parking lot?

12  A.   I don't know.

13  Q.   And that was at the very beginning of the time you were

14  there?

15  A.   Yes.

16          MR. FEINBERG:  I have nothing else.  Thank you.

17          THE COURT:  All right.

18          Mr. Garland, anything?

19          MR. GARLAND:  No redirect.

20          THE COURT:  You may step down, Mr. Price.

21          THE WITNESS:  Thank you.

22               (Witness stepped down)

23          MR. BOOKBINDER:  The United States calls Brian

24  O'Connor.

25          OFFICER BRIAN O'CONNOR, DULY SWORN BY THE CLERK

1        THE CLERK:  Please state and spell your full name for

2   the record.

3        THE WITNESS:  It's Detective Brian O'Connor.  The last

4   name is O, apostrophe, C-O-N-N-O-R.

5        MR. BOOKBINDER:  I apologize, your Honor.  I am just

6   putting on the witness stand, if it's okay, the exhibits we

7   intend to use, I don't believe there's any objection to them,

8   just to speed things up.

9        THE COURT:  All right.

10                        DIRECT EXAMINATION

11   BY MR. BOOKBINDER:

12   Q.   Good morning.

13   A.   Good morning.

14   Q.   How are you employed?

15   A.   For the City of Cambridge Police Department.

16   Q.   What's your title at the Cambridge Police Department?

17   A.   Detective.

18   Q.   How long have you been a detective?

19   A.   For approximately about 3 1/2 years.

20   Q.   What did you do before that?

21   A.   I was a patrol officer.

22   Q.   How long were you a patrol officer?

23   A.   Since June of 2000.

24   Q.   As a Cambridge Police detective, are you a member of the

25   Electronic Crimes Task Force?

1    A.    Yes, I am.

2    Q.    What is that?

3    A.    It's a group of local police departments as well as the

4    Secret Service that are trained to handle electronic crimes

5    cases involving computers.

6    Q.    Let me turn your attention to the afternoon of April 30th

7    of this year.  Were you working at the Cambridge Police

8    Department that day?

9    A.    Yes, I was.

10   Q.    At some point did you hear a call about an incident

11   relating to Eastern Bank?

12   A.    Yes, I did.

13   Q.    After you heard that transmission what, if anything, did

14   you do?

15   A.    When the transmission came out from our dispatch center, I

16   was sitting actually at my desk working on an overtime

17   assignment, and they had given out information that there was

18   some suspicious activity going on at the Eastern Bank located

19   up in Fresh Pond.  They gave a description of an individual as

20   well as a license plate.  While sitting at my desk, I ran the

21   license plate through the CJIS system, got some information

22   back on that.

23   Q.    What did you learn?

24   A.    It was registered to an individual by the first name of

25   Florian (ph), last name is Demaroscue (ph)?  It began with a D.

1    It was out of New York.

2    Q.   Okay.  Thank you.  As of April 30th were you familiar with

3    any kinds of crimes that were targeting ATM machines?

4    A.   Yes, I was.

5    Q.   What were those?

6    A.   I'm also a member of the International Association of

7    Financial Crime Investigators, so I get their -- I'm part of

8    their e-mail lists, work a lot with the banks with the cases

9    that I do.  So, they were sending out alerts and bulletins for

10   a group that was going around regionally using skimming devices

11   on ATM machines.

12   Q.   You mentioned a group that was going around regionally.

13   What did you know about the members of that group, if anything?

14   A.   That it was a group of Romanians that were going around

15   pretty much the New England area.

16   Q.   At some point after you received that call did you end up

17   going to the bank that afternoon?

18   A.   Yes, I did.

19   Q.   Who did you go with?

20   A.   I went with Detective Tom Flynn and Detective David

21   Atherton.

22   Q.   When you arrived at the scene of the bank, the mall of the

23   bank, where did you go?

24   A.   When we arrived at the bank I went actually into the

25   vestibule area of the bank to take a look at the ATM to see if

1    I could see anything that was out of the ordinary.

2    Q.   What did you see?

3    A.   When I walked into the ATM vestibule, I looked at the ATM

4    and to me it did not appear right.

5    Q.   Could you take a look at what's been marked as

6    Government's Exhibit 2 in front of you there?  Do you recognize

7    that photo?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   This is a photo of -- this is one of -- this is an ATM

11   photo.

12   Q.   Actually, let me clarify.  What's been marked as Exhibit 2

13   is a series of four photos; is that correct?

14   A.   That is correct.

15   Q.   Okay.  So, let's focus on the first two photos.  Are those

16   pictures of that ATM that we are discussing?

17   A.   Yes, they are.

18            THE COURT:  Does it make sense to identify the package

19   as 2A, 2B, 2C and 2D --

20            MR. BOOKBINDER:  That's fine.

21            THE COURT:  -- just for clarification?

22            So, the first two are 2A and 2B.

23            MR. BOOKBINDER:  Yes, your Honor.

24   BY MR. BOOKBINDER:

25   Q.   So, the photos that are in Exhibit 2A and 2B that show

1    that ATM, is that the way it looked when you first arrived

2    there that day, or were those taken later, do you know?

3    A.   These were taken after the device was removed.

4    Q.   All right.  So, let's set those aside, then.  We'll get to

5    that.

6         Okay.  You said you noticed something that seemed

7    amiss about the ATM.  What was it?

8    A.   What appeared out of place on the ATM was the card reader

9    itself.  It seemed to be sticking out a little bit from the

10   machine, as well as there was a small metal strip on the

11   outside of the card reader on the right-hand side where you

12   insert your debit card.

13   Q.   Did you touch it?  Did you try to do anything with it?

14   A.   I tried to wiggle it and it would not budge.

15   Q.   What did you do at that point?

16   A.   At that point I contacted -- I had a contact for Eastern

17   Bank.  I had contacted her.  Her name is Barbara Minkwitz.  She

18   works --

19   Q.   Can you spell that?

20   A.   Her last name is M-I-N-K-W-I-T-Z, first name Barbara.

21   Q.   What did she do for Eastern Bank?

22   A.   She works in the Fraud Department.

23   Q.   What did you ask her for?

24   A.   I alerted her of the situation that we had received a call

25   for a suspicious activity at the bank.  I told her that I was

1    currently at the bank itself looking at the ATM and that the

2    car reader did not appear correct.

3            I asked her if she could have somebody check the bank

4    surveillance photo as well as have the branch manager come

5    down, who is more familiar with that particular ATM.

6    Q.   Did the branch manager arrive after that?

7    A.   Yes, she did.

8    Q.   And did she come in and look at the ATM with you?

9    A.   Yes, she did.

10   Q.   What was her assessment?

11   A.   Her comments to me was that the way that the ATM looked

12   when she arrived did not appear to be -- it appeared that

13   something was different on the ATM.

14   Q.   At some point did any federal law enforcement arrive at

15   the scene?

16   A.   Yes, they did.

17   Q.   Who was that?

18   A.   That was Special Agent Brett Seidel from the Secret

19   Service.

20   Q.   Did he come in and take a look at the ATM as well?

21   A.   Yes, he did.

22   Q.   What did he do?

23   A.   He was able to remove the device from the machine.

24   Q.   How did he do that?

25   A.   At the time I was in the bank looking at photos, and I

1    believe that he had used I think it was either a pocket knife

2    to kind of detach the device from the machine.

3    Q.   If you could now take a look at Exhibit 2, and focusing

4    you on what we will call pages 2C and 2D, the third and the

5    fourth photos -- let's start with 2C.  What does that show?

6    A.   2C is the front of the devices that were removed from the

7    machine.  On the left-hand side was the device that was removed

8    from the card reader section of the ATM, which on the ATM it's

9    going to be on the right-hand side.  And on the right-hand side

10   of this photo is the device that contained the pinhole camera,

11   which would have been on the left-hand side of the machine as

12   you are looking at it.

13   Q.   So, those devices literally had been placed on the

14   machine, stuck there, essentially?

15   A.   That is correct.

16   Q.   How were they stuck to the machine?

17   A.   With double-sided tape.

18   Q.   And Secret Service Agent Seidel had removed them.  Who

19   took these pictures?

20   A.   These photos were taken by me.

21   Q.   So, these were the front.  This picture shows the front of

22   those two devices, and then 2D, the next photo, what's that?

23   A.   These are the back of the devices.

24   Q.   What's your understanding, just in a very brief fashion,

25   of what the skimmer does?  The device that sits on the card

1   reader, what does it do?

2   A.   The part of the device that sits on the card reader, when

3   an individual inserts their card into the ATM machine, part of

4   the device that's on the card reader will capture the

5   information that's on the magnetic strip of the card, which

6   will include the account number, any information that's

7   contained on that strip that the normal ATM would read.

8   Q.   And the purpose of the pinhole camera on the other device?

9   A.   The pinhole camera part of the device is focused on the

10   keypad of the ATM machine, so when a person was to insert their

11   card the pinhole camera would capture the PIN number so that

12   the person that's using the skimming device would have all the

13   information necessary for that account.

14   Q.   Those devices, Agent Seidel removed them that afternoon

15   while Mr. Pascu was still at the mall; is that correct?

16   A.   That is correct.

17   Q.   Can you take a look at what's been marked --

18        MR. BOOKBINDER:  And, sorry, your Honor.  I am not

19   sure that I did this for the record.  The Government offers

20   Exhibit 2.

21        THE COURT:  All right.  I gather there are no

22   objections to them.  They are received.

23    (Government's Exhibit No. 2A thru 2D received into evidence)

24   BY MR. BOOKBINDER:

25   Q.   And now we will turn to what has been marked as Exhibit 3.

| | |
|---|---|
| 1 | What is that a picture of?  Who is that a picture of? |
| 2 | A.   This is a photo of Mr. Pascu. |
| 3 | Q.   Who took it? |
| 4 | A.   That was taken by me. |
| 5 | Q.   When? |
| 6 | A.   It was taken when I had gone into the vestibule prior to |
| 7 | Special Agent Seidel arriving at the location. |
| 8 | Q.   So, after the time you had initially looked at the ATM but |
| 9 | before the Secret Service Agents arrived? |
| 10 | A.   That's correct. |
| 11 | MR. BOOKBINDER:  Your Honor, the Government offers |
| 12 | Exhibit 3. |
| 13 | MR. FEINBERG:  No objection. |
| 14 | THE COURT:  It is received. |
| 15 | (Government's Exhibit No. 3 received into evidence) |
| 16 | BY MR. BOOKBINDER: |
| 17 | Q.   How was it that you came to take this picture?  Did you |
| 18 | ask Mr. Pascu if you could take his photo? |
| 19 | A.   Yes, I did. |
| 20 | Q.   What did he say? |
| 21 | A.   He said, "Yes." |
| 22 | Q.   Did you ask him to smile in the picture? |
| 23 | A.   I did not. |
| 24 | Q.   He did that on his own? |
| 25 | A.   That's correct. |

1  Q.   Other than asking if you could take his picture, did you

2  talk to him?

3  A.   I didn't have a lengthy conversation with him.  I don't

4  recall the nature of the conversation.

5  Q.   Is it fair to say you spoke to him briefly?

6  A.   Correct.

7  Q.   And you don't remember what either of you said?

8  A.   That's correct.

9  Q.   Did he appear to have any trouble understanding what you

10  were saying to him?

11  A.   No.

12  Q.   Did you have trouble understanding what he was saying back

13  to you?

14  A.   No.

15  Q.   Did he speak with an accent?

16  A.   There was a slight accent, but it was understandable.

17  Q.   You mentioned that you had asked a Ms. Minkwitz from

18  Eastern Bank if someone could take a look at the surveillance

19  footage.

20  A.   That's correct.

21  Q.   That afternoon while you were at the scene, did you

22  receive surveillance photos?

23  A.   Yes, I did.

24  Q.   How did you get them?

25  A.   They were e-mailed to me.

1   Q.   The photos you received initially, did you take a look at

2   them?

3   A.   Yes, I did.

4   Q.   Did they show someone in the ATM that afternoon?

5   A.   Yes, they do.

6   Q.   Was the person shown in those photos Mr. Pascu?

7   A.   The initial photos were not.

8   Q.   Did you recognize who it was?

9   A.   Originally we had matched it up with a passport that was

10  located in the vehicle, and based on the photo that was on the

11  passport identified that individual to be Ionut Moisoneau.

12  Q.   Was this the passport that came out of Mr. Pascu's car?

13  A.   That's correct.

14  Q.   You didn't take it out of the car?

15  A.   That's correct.

16  Q.   In fact, did you ever go to Mr. Pascu's car at the scene?

17  A.   No, I did not.

18  Q.   But other officers had told you it came out of the car?

19  A.   That's correct.

20  Q.   And the person in that passport photo appeared to be the

21  person in the initial set of surveillance photos you received?

22  A.   That is correct.

23  Q.   After looking at those did you ask anyone from the bank

24  whether there were other ATM photos?

25  A.   Yes, I did.

1    Q.   Did you get a second set of photos?

2    A.   I did.

3    Q.   Can you take a look at what's been marked as Exhibit 4,

4    please.  4 has five pages.

5         MR. BOOKBINDER:  And these, actually, your Honor, have

6    Bates numbers on the bottom, so I will try to use those in

7    referring to them.  They are Bates numbers 168 through 173.

8         What do you recognize these photos to be?

9    A.   These are the second set of photos that were sent from the

10   investigator at Eastern Bank.

11   Q.   You said you got them by e-mail.  What were you looking at

12   them on, what kind of device?

13   A.   Initially, the initial photos I had received, because I

14   get my work e-mail forwarded to my phone, so I had looked at

15   those initially, but I did have my work laptop with me, which

16   had access to Department e-mail, which, once the bank manager

17   -- I was able to pull them up on a full screen.

18   Q.   You looked at them on your laptop at the scene?

19   A.   That is correct.

20        MR. BOOKBINDER:  Your Honor, the Government offers

21   Exhibit 4.

22        MR. FEINBERG:  No objection.

23        THE COURT:  It is received.

24        (Government's Exhibit No. 4 received into evidence)

25   BY MR. BOOKBINDER:

1    Q.   The first page of that exhibit, which is Bates number 168,

2    is it fair to say that only the top left picture shows what

3    appears to be a person?

4    A.   That is correct.

5    Q.   And hard to make much out of that?

6    A.   That's correct.

7    Q.   The next page, page 169, what do you see there?

8    A.   In the top left photo there's an individual standing at

9    the desk that's inside the ATM vestibule, as well as on the

10   right-hand top photo it's a shot from the camera that's in the

11   ceiling corner looking down on that same table.

12   Q.   I don't know how good your copy of the picture is, but

13   when you were looking at these -- let me back up.  Fair to say

14   that these are photocopies of those pictures that you are

15   looking at right now?

16   A.   It appears, yes.

17   Q.   Do you remember whether the quality was better or worse

18   when you were looking at the pictures at the scene?

19   A.   The quality was better.

20   Q.   Were you able to tell from looking at these pictures what

21   that person was wearing?

22   A.   From these pictures, yes.

23   Q.   What was the person wearing?

24   A.   It was blue jeans and there was a dark-colored vest and a

25   black hooded sweatshirt.

1    Q.   The next page of this exhibit, 170, what does the figure

2    in the photos appear to be doing?

3    A.   Appears to be picking up one of the pamphlets that is on

4    the counter.

5    Q.   And if you could skip to the last page, which is page 172.

6              THE COURT:  The last page I have is 173.

7              MR. BOOKBINDER:  I'm sorry.  I apologize, your Honor.

8    BY MR. BOOKBINDER:

9    Q.   Look at the second-to-last page, 172.  What does the

10   person appear to be doing in that page?

11   A.   Walking out of the bank.

12   Q.   What was it in these pictures that allowed you to identify

13   them as being pictures of a particular individual?

14   A.   It would be the clothing.

15   Q.   Based on the clothing that you saw in these photos and

16   clothing of anyone you saw that day, who did you identify them

17   to be?

18   A.   Mr. Pascu.

19   Q.   Was Mr. Pascu arrested later that afternoon?

20   A.   Yes, he was.

21   Q.   What happened to his car?

22   A.   The vehicle was towed to the Cambridge Police Department,

23   where it was inventoried and then sent to the tow yard.

24   Q.   Did you participate in the inventory search?

25   A.   Yes, I did.

1    Q.   What was your role?

2    A.   I had taken some photographs during the inventory while

3    the vehicle was being inventoried by Detective Flynn and

4    Special Agent Doharcan (ph).

5    Q.   Can you take a look at what's been marked as Exhibit 5,

6    please.  What is Exhibit 5?

7    A.   This is the Cambridge Police Department's Vehicle

8    Inventory Policy.

9         MR. BOOKBINDER:  Your Honor, the Government offers

10   Exhibit 5.

11        THE COURT:  All right.  It is received.

12   (Government's Exhibit No. 5 received into evidence)

13   BY MR. BOOKBINDER:

14   Q.   The search that was done that afternoon was done in

15   accordance with this policy?

16   A.   Yes, it was.

17   Q.   I would just like to focus you on two small portions of

18   the policy.  The section of the policy that is entitled

19   "Procedure," would you just read the first sentence of

20   Subparagraph A.

21   A.   "An inventoried search of a vehicle will be conducted on

22   any vehicle ordered towed or taken into the custody of this

23   department except for declared snow emergencies and seasonal

24   street cleaning."

25   Q.   Is that why this car was inventoried?

1   A.   Yes.

2          INTERPRETER BOLA-FERRIERO:  I'm sorry, your Honor.

3   The interpreter didn't hear everything, the whole section.

4          THE COURT:  If you could read that again, and slowly

5   because it is important for the interpreter and also for the

6   court reporter to be able to pick it up.

7          INTERPRETER BOLA-FERRIERO:  Thank you, your Honor.

8   A.   "An inventory search of a vehicle will be conducted on any

9   vehicle ordered towed or taken into the custody of this

10  department except for declared snow emergencies and seasonal

11  street cleaning."

12  BY MR. BOOKBINDER:

13  Q.   If you could now take a look at Paragraph D and, again,

14  slowly just read the first two sentences in that paragraph.

15  A.   Numbers 1 and 2 or just the initial paragraph?

16  Q.   No.  Just right next to the letter "D"?

17  A.   "The officer will begin by thoroughly examining the

18  vehicle's exterior for damage and/or missing parts.  The

19  officer will then examine the interior of the vehicle for

20  damage, missing parts and personal property."

21  Q.   How thorough are Cambridge Police inventory searches?

22          MR. FEINBERG:  Objection.

23  A.   Inventory searches are pretty thorough.

24          THE COURT:  Just a moment.  I am going to overrule the

25  objection.  This is a custom-and-practice question, as far as I

1    am concerned.

2           Go ahead.

3    A.    As far as inventory searches that I conduct, they are

4    thorough because of the reason of an individual's property that

5    is in the vehicle.  I want to make sure that everything is

6    accounted for before it sits in the tow yard.

7    BY MR. BOOKBINDER:

8    Q.    During an inventory search is it typical to look

9    everywhere in the car, including the trunk?

10   A.    That's correct, as long as we have access to the trunk

11   without causing damage to the vehicle.

12   Q.    How about the portion of the trunk where the spare tire is

13   stored?

14   A.    Yes.  If it's not locked we will.

15   Q.    And why is it that you look in places like that?

16   A.    Individuals will put personal property anywhere in the

17   vehicle and, like I said before, if it goes to a tow yard we

18   want to make sure everything is accounted for before it's

19   sitting in a big, open lot, rather than have individuals come

20   and say that this was in the vehicle, that was in the vehicle.

21   I personally want to make sure that everything in that vehicle

22   is accounted for.

23   Q.    In this case, in this inventory search, what did you or

24   Detective Flynn find in the car of note?

25   A.    In the vehicle there was personal property, there was a

1    GPS unit that was located in the vehicle, and in the trunk of

2    the vehicle sitting on top of the spare tire was a laptop

3    computer.

4    Q.   Do you remember whether there was a cell phone in the car

5    as well?

6    A.   I believe there was.

7            MR. BOOKBINDER:  Your Honor, if I could just have a

8    moment?

9            THE COURT:  Yes.

10               (Counsel conferring off the record)

11           MR. BOOKBINDER:  Your Honor, the Government has

12   nothing more, except to say Exhibit 6 in this case that we have

13   agreed with defense counsel on I think is the DVD, a portion of

14   the DVD.

15           THE COURT:  I attempted to open it last night and

16   could not.

17           MR. BOOKBINDER:  Okay.  I apologize.

18           THE COURT:  I did observe the interview with, I guess,

19   Officer DeSimone.

20           MR. BOOKBINDER:  Your Honor, if I could ask, were you

21   watching it on a DVD player or a computer?

22           THE COURT:  Computer.

23           MR. BOOKBINDER:  Yeah.  I think it's a little finicky

24   as far as which program opens it.  We can either provide a DVD

25   player that you could use to watch it on, because I know it

1    will work on a DVD player and it should work on a computer, but

2    I had a similar problem and then was able to find a program.

3           THE COURT:  I would prefer to have it in a format that

4    I can view it on a computer.

5           MR. BOOKBINDER:  We can have it recorded into a

6    different format that ought to be easier to see on a computer

7    and bring it down to Mr. Lovett.

8           So, assuming there's no objection, the Government will

9    just offer that now.

10          THE COURT:  Just so I understand, because it was

11   tantalizing to put it in and see booking on it, but what is it?

12          MR. BOOKBINDER:  Your Honor, what it is is, it's a

13   video that shows the booking procedure.  It's Mr. Pascu

14   standing at a window with an officer on the other side of the

15   glass window asking him a series of questions.

16          THE COURT:  All right.

17          MR. BOOKBINDER:  And it's about 14 minutes long.  It's

18   an excerpt of that booking process.

19      (Government's Exhibit 6 received into evidence)

20          THE COURT:  Mr. Feinberg, what I was going to do is

21   take a break at this point before we do cross-examination.

22          It is clear to me that I am going to want to look at

23   the transcript here.  There are enough inconsistencies, I will

24   say, without characterizing them as material or just everyday

25   inconsistencies, but enough so that I want to look at the

1    transcript of what was said here, because even in their

2    testimony they had different things to say.  I just want to be

3    sure I have a grasp of that.  It will take a little while to

4    put that together.

5          I can hear argument, but I would prefer not to until I

6    have had a chance to review the transcript.  If the parties

7    want to submit something, that is fine.  The legal issues I

8    think I understand, so I am not sure if I am not inviting

9    anything further.  But for purposes of examination of Detective

10   O'Connor, I propose to take a break at this point and then come

11   back.

12         MR. FEINBERG:  That's fine, your Honor.  There are two

13   other witnesses, but they will be short, and I am quite certain

14   we will finish by the lunch hour.

15         THE COURT:  All right.  So, in any event, we will

16   take, say, 20 minutes, a break right now, continue with your

17   examination of Detective O'Connor.  There is no need to speed

18   the reformatting of Exhibit 6, but I would like to have it

19   today so I have heard everything in a compressed period of

20   time.

21         MR. BOOKBINDER:  We should be able to get that to you

22   this afternoon, your Honor, I expect.

23         MR. FEINBERG:  And based on the representations, I

24   have no objection.  I am assuming these are the same 14 minutes

25   of an hour-long booking process that is going to be reproduced.

1          THE COURT:  I got an hour's worth out of the DeSimone

2    thing.  I assume that Mr. DeSimone was not being asked to

3    consent in Italian.

4          MR. FEINBERG:  I'm sorry, your Honor?

5          THE COURT:  I assume that Officer DeSimone would not

6    be asked to consent in Italian to some sort of Miranda.

7                    (Laughter)

8          MR. BOOKBINDER:  Correct, your Honor.

9          THE CLERK:  All rise.

10    (The Honorable Court exited the courtroom at 10:55 a.m.)

11                        (Recess taken)

12          THE CLERK:  All rise.

13    (The Honorable Court entered the courtroom at 11:15 a.m.)

14          THE CLERK:  This Honorable Court is back in session.

15    You may be seated.

16          THE COURT:  Mr. Feinberg, you may inquire.

17          MR. FEINBERG:  Thank you, Judge.

18                    CROSS-EXAMINATION

19    BY MR. FEINBERG:

20    Q.   Good morning, Detective.

21    A.   Good morning.

22    Q.   Do you happen to remember what time you arrived

23    approximately?

24    A.   I don't recall the exact time.  It would have been between

25    1:00 and 2:00.  I don't recall the exact time.

1    Q.   Well, would it refresh your memory if I told you that the

2    first officer on the scene, Officer Allen, arrived at about

3    2:00?

4    A.   If he arrived at 2:00 it would have been after that.

5    Q.   I understand.  I am asking about does that help you in any

6    way?  If it doesn't, it doesn't.  And if your report helps you,

7    that would be fine as well.  Do you have your report in front

8    of you?

9    A.   I do have my report.

10   Q.   Does it help you?  Is there anything in there that

11   indicates when you actually arrived at the scene?

12   A.   I would have to look at the report.

13   Q.   Go right ahead.

14   A.   (Witness complied).  It does not mention a specific time,

15   but it would have been after 2:00.  It would have been after

16   the initial --

17   Q.   I guess what I am asking you is how much after, if you

18   know?

19   A.   I don't recall the exact time.

20   Q.   In any event, when you got the call -- did you get the

21   call to go to the mall?

22   A.   We were not -- the detective unit was not dispatched to

23   the call.  It was a dispatch that was given out to the units

24   that worked that area, the patrol units.

25   Q.   I understand.  But at some point did you get a call from

1    Officer Price to come, requesting your presence?

2    A.   I don't recall that.

3    Q.   In any case, after the ECC dispatch, you sat down and you

4    looked at the license plate; is that correct?

5    A.   Correct.  When they had given out the broadcast, I queried

6    the license plate.

7    Q.   And when you did that there was nothing unusual that

8    caused you to be suspicious about the registration or anything

9    like that; is that true?

10   A.   Everything came back to an active registration, to a valid

11   registration.

12   Q.   When you did arrive you spoke to officers, am I correct?

13   A.   I believe I might have had a brief conversation with some

14   of the officers and then I went into the vestibule of the bank.

15   Q.   But you became aware at some point that a search of

16   Mr. Pascu himself had occurred prior to your arrival?

17   A.   Not that I recall.

18   Q.   Do you have the interview with the Secret Service in front

19   of you?

20   A.   Do you know which -- is it in a report or is it a

21   separate --

22   Q.   Yes.

23          MR. FEINBERG:  May I, Judge?

24          THE COURT:  Yes.

25   BY MR. FEINBERG:

1    Q.   I'm showing you a report of an interview of you with the

2    Secret Service on July 12th, and I'm asking you if the first

3    sentence of the fourth paragraph refreshes your memory, where

4    it says, "Upon arriving at the scene..."

5    A.   If it's in the memorandum of our interview, then yes.

6    Q.   Well, does that refresh your memory that at the time you

7    arrived you became aware that Mr. Pascu had already been

8    searched in some way, his person?

9    A.   It does not.

10   Q.   That does not refresh your memory?

11   A.   It does not.

12   Q.   Am I reading this correctly, that, "Upon arriving at the

13   scene Detective O'Connor reported that some type of search of

14   Pascu had already occurred though not witnessed directly by

15   him," meaning you?

16   A.   Right.  If it's in there, then I don't recall which

17   officer had said that.  I wasn't sure if they were referring to

18   his individual or the vehicle.

19   Q.   So, you didn't say --

20   A.   I did not witness any search of the vehicle or of

21   Mr. Pascu.

22   Q.   Do you recall at the time you arrived being told that

23   Mr. Pascu and the vehicle had been searched?

24   A.   I do not recall that right now.  If it's in that

25   memorandum of the interview, then --

1    Q.    You will accept that?

2    A.    Correct.

3    Q.    And you will accept the fact that you told the Secret

4    Service Agent who interviewed you that some type of search of

5    Pascu had already occurred, and when you're describing that now

6    you're saying it's either Pascu or the vehicle or both; is that

7    correct?

8    A.    I don't recall.  When I showed up on the scene I don't

9    recall if I was told.  My memory, I do not recall right now.

10   Q.    At some point after your arrival do you recall using your

11   laptop?

12   A.    Yes.  I used the department-issued laptop to access e-mail

13   to look at the photos.

14   Q.    And did you also use the laptop to search for addresses of

15   ATM machines?

16   A.    There were some addresses that were given that were

17   located by officers in the vehicle.

18   Q.    That's what I am asking you about.

19   A.    Yes.

20   Q.    You were given a single sheet of paper, am I correct?

21   A.    Correct.

22   Q.    And it was a small piece of paper, it wasn't a big piece

23   of paper like this, was it?

24   A.    That's correct.

25   Q.    It was from a little notebook?

1    A.   Correct.

2    Q.   And who gave you that piece of paper?

3    A.   I don't recall which officer had given me that paper.

4    Q.   And when you were given that piece of paper your

5    investigation and your thinking was that those addresses might

6    be the addresses of other banks in the area, am I correct?

7    A.   Correct.

8    Q.   Other banks with ATM machines or ATM machines?

9    A.   Correct.  The addresses on the sheet, to my understanding,

10   appeared to be addresses located within a financial district,

11   just based on the names of the streets.

12   Q.   And so, you took that piece of paper.  You don't remember

13   who gave you the piece of paper?

14   A.   That's correct.

15   Q.   If I went through the list of officers who were there,

16   would that help you at all?

17   A.   I do not recall which officer gave me the paper.

18   Q.   Do you recall a conversation with that officer?

19   A.   I do not.

20   Q.   Do you recall whether or not you had an understanding at

21   the time as to where the piece of paper came from?

22   A.   The piece of paper came from the vehicle.

23   Q.   From the car?

24   A.   That's correct.

25   Q.   And you then took out your laptop to verify whether or not

1    those addresses on the piece of paper matched bank ATM

2    locations, am I correct?

3    A.   With the addresses that I initially had when I was on the

4    phone speaking to the representative from Eastern Bank to

5    request the bank surveillance photos prior to using the laptop

6    I had run the addresses by her, and she had said that some of

7    those addresses were Eastern Bank locations.

8    Q.   And then the next step was to take out your laptop and

9    verify that; is that correct?

10   A.   Right.  I had the laptop inside of the bank when the

11   branch manager had arrived.

12   Q.   What I am asking you is whether or not at any point you

13   had the laptop sitting on either the trunk or the hood of a

14   cruiser or police car outside when you were checking the

15   addresses on the piece of paper to verify whether or not they

16   were ATM locations.

17   A.   Right.  There was a point that I did have the laptop on

18   the back of the cruiser.

19   Q.   Fair enough.

20   A.   Correct.

21   Q.   And that was at a point in time not when you first arrived

22   but when you had gone into the bank and came back out and you

23   don't remember who gave you the piece of paper; is that

24   correct?

25   A.   I do not recall which officer gave me the paper.

1   Q.   And you don't remember when he gave you the piece of

2   paper?

3   A.   That is correct.

4   Q.   He might have given you the piece of paper soon after you

5   arrived but you just don't remember?

6   A.   When I arrived on scene, I headed into the bank vestibule.

7   Q.   So, you didn't get it at least until after you got back

8   out of the vestibule?

9   A.   That's correct.

10  Q.   And then at a later point do you recall that Officer Price

11  gave Detective Atherton three additional pieces of paper?

12  A.   I can't speak for Detective Atherton.

13  Q.   Well, did Detective Atherton give you any pieces of paper?

14  A.   There were additional pieces of paper that I came across.

15  I don't remember who had given them to me.

16  Q.   All right.

17  A.   There were other addresses on those pieces of paper.

18  Q.   Correct.  That's all I'm getting at.  So, first you get

19  the single sheet of paper, correct?

20  A.   Correct.

21  Q.   And then at some later point some other police officer,

22  you don't remember who, gave you additional pieces of paper

23  with additional addresses on them?

24  A.   Correct.

25  Q.   Other than the location of that first piece of paper, did

1    you ever ask how it came about that the car was searched?

2    A.   It was my understanding that there was -- I don't know

3    which officer had asked, but they had gotten permission from

4    Mr. Pascu to look through the vehicle and they were given the

5    keys to the vehicle.

6    Q.   And your testimony today is your understanding is that

7    Mr. Pascu actually went into his pocket and gave the keys to

8    the car to some police officer?

9    A.   I was not present for --

10   Q.   For anything.

11   A.   For when permission was given, correct.  I was not there.

12   Q.   At any point did you see any items on the hood or trunk of

13   a police car that you concluded were the belongings of

14   Mr. Pascu?

15   A.   There was I believe a notebook on the back of the cruiser.

16   Q.   Anything else?

17   A.   I believe that the passport for Mr. Moiceanu was also on

18   the back.

19   Q.   So, the passport, did you understand that that was the

20   product also of the search of the car?

21   A.   It was located in the vehicle.

22   Q.   That was your understanding --

23   A.   Correct.

24   Q.   -- that it was found in the car?

25   A.   Correct.

1    Q.   And the other item, I'm sorry, was what?

2    A.   Was a notebook.

3    Q.   A notebook?

4    A.   Right.

5    Q.   Was that also in the car?

6    A.   To my understanding, yes.

7    Q.   And did you ever see a set of keys to the car?

8    A.   I don't recall if I did see the keys.

9    Q.   Do you know who had a set of keys?

10    A.   That I do not recall.

11    Q.   When the car was towed it didn't need keys, am I correct?

12    A.   There were keys that we had with the vehicle when the

13  vehicle was towed.

14    Q.   How did they come into your possession?

15    A.   I don't recall which officer had given them to me.

16    Q.   Somebody gave you the set of keys.

17    A.   The keys were with the vehicle, so we had the keys with

18  the vehicle when it was back at the police station.

19    Q.   I'm still at the scene; I'm not at the police station.

20    A.   Okay.

21    Q.   I'm asking you at what point you actually saw the keys for

22  the first time.  Is it at the scene?

23    A.   I believe it was back at the police station.

24    Q.   All right.  So, the answer to my question is, no, it was

25  not at the scene; is that correct?

1   A.   Correct.  I believe, correct.

2   Q.   The photographs that you took, they were all photographs

3   that you took at the police station of the inside of the car, I

4   mean?

5   A.   Of the car, that's correct.  The only photos that I took

6   at the scene were of the ATM and of Mr. Pascu.

7            MR. FEINBERG:  May I have a moment, your Honor?

8                    (Pause)

9   BY MR. FEINBERG:

10  Q.   I'm showing you what I guess we can mark as 1C for

11  identification and ask you, is this one of the photographs that

12  you took?

13  A.   It appears to be a vehicle.  I can't tell, based on this

14  picture, where the photo was taken from.

15  Q.   Well, if it was taken at the scene --

16  A.   If it was taken at the police station, I took the photo,

17  because I was taking the photos of the vehicle at the station.

18  Q.   So, the answer to my question is you don't know whether or

19  not that's a photo that you took?

20  A.   Correct.  Based on this, I cannot tell.

21  Q.   Can you look through and see if there is any other photos

22  of the interior of the car that you took in the station rather

23  than at the scene?

24  A.   These photos I took.  These are inside of the bay at the

25  police station.

1    Q.    Stop right there.  Let's go back.

2    A.    Okay.

3    Q.    The first half dozen or so photographs that you looked

4    through, is it fair to say that you cannot identify whether or

5    not they were taken at the scene or in the station?  Is that a

6    fair statement?

7    A.    Based on these photographs, I cannot.  This was taken at

8    the station, just based on the background.  Due to the quality

9    of the photos I cannot tell.

10         MR. FEINBERG:  Thank you.  I will have these marked,

11   your Honor.

12         THE COURT:  Defendant's 1.  Defendant's 1 is now the

13   collection of the site, the strip mall.

14         MR. FEINBERG:  Defendant's 1 for identification.

15         THE COURT:  Well, we already have regular 1A and 1B.

16         MR. FEINBERG:  Right.

17         THE COURT:  So, whatever it is that you are showing I

18   think has to be marked as Exhibit 4.

19         MR. FEINBERG:  We can do that later.

20         THE COURT:  Yes.  Just so both the record and I

21   understand what it is that you have culled out.

22         MR. FEINBERG:  It's a series of photographs of the

23   interior of the car; it is unclear where they were taken,

24   whether at the scene or --

25         (Defendant's Exhibit No. 4 received into evidence)

1          THE COURT:  All right.  At this point we have, at

2     least as far as I understand, one car interior photo.  That is

3     Government's Exhibit 1, which is the spare tire compartment.

4          MR. FEINBERG:  Correct.  May I have a moment, your

5     Honor?  I am almost done.

6          THE COURT:  Yes.

7                         (Pause)

8     BY MR. FEINBERG:

9     Q.   From the time you arrived, Officer, until the time you

10    placed Mr. Pascu under arrest, how long a period of time

11    elapsed?

12    A.   I don't recall the exact time period.

13    Q.   Can you give me your best estimate?

14    A.   Maybe 45 minutes.  I could be wrong.  I would have to look

15    at the CAD call from our dispatch center to find out what time

16    we cleared -- for the exact times.

17    Q.   Do you have any recollection of what time you arrived back

18    at the station?

19    A.   I do not recall the time.

20         MR. FEINBERG:  I have nothing else.

21         THE COURT:  All right.

22         MR. BOOKBINDER:  No redirect, your Honor.

23         THE COURT:  All right.  You may step down, Detective.

24         THE WITNESS:  Thank you, your Honor.

25         MR. BOOKBINDER:  No more evidence, your Honor.

1          THE COURT:  Apart from the Exhibit 6 that you will

2     submit?

3          MR. BOOKBINDER:  That's right, your Honor.

4          MR. FEINBERG:  I will give this to -- this is No. 4

5     for the defendant.

6          THE COURT:  We will do it afterwards unless you want

7     me to look at it now.

8          MR. FEINBERG:  Officer Rivera.

9          OFFICER MARLIN RIVERA, DULY SWORN BY THE CLERK

10         THE CLERK:  Please state and spell your full name for

11    the record.

12         THE WITNESS:  It's Marlin Rivera, spelled R-I-V-E-R-A.

13                         DIRECT EXAMINATION

14    BY MR. FEINBERG:

15    Q.   Good morning, Officer.  My name is Matthew Feinberg.  I

16    represent the defendant in this case.

17    A.   Good morning, sir.

18    Q.   Officer Rivera, directing your attention to April 30th,

19    2011, did you arrive at the Fresh Pond Mall at a certain time?

20    A.   Yes, I did, sir.

21    Q.   How did you arrive there?

22    A.   In a cruiser, patrol cruiser.

23    Q.   And who was with you?

24    A.   Officer Gamble.

25    Q.   And did you and Officer Gamble then go to a specific

1    location within the mall?

2    A.    We did, sir.

3    Q.    Where did you go?

4    A.    To where the defendant had been stopped.

5    Q.    And that was outside near the walkway along the line of

6    stores?

7    A.    That is correct, sir.

8    Q.    Who was there when you arrived besides the defendant?

9    A.    Besides him, it was Officer Price, Officer Allen and

10   Officer Marshall.

11   Q.    And when you first arrived, did you have a conversation

12   with anyone?

13   A.    I did.

14   Q.    Who did you talk to?

15   A.    To Officer Allen and Officer Marshall.

16   Q.    And you learned from Officers Allen and Marshall that this

17   fellow was being stopped potentially because he was tampering

18   with an ATM machine?

19   A.    That is correct.

20   Q.    And did they instruct you what to do or where to go?

21   A.    Not at the time, sir.

22   Q.    And when you arrived at the scene, did you also see

23   Detective O'Connor there?

24   A.    I don't think he was there at the time I got there, sir.

25   Q.    When you arrived at the scene, were Kevin Donofrio and

1   Brian Hussey there?

2   A.   After the fact, after I got there.  I got there first.

3   Q.   All right.  And how long after you arrived did Hussey and

4   Donofrio arrive?

5   A.   Five or ten minutes.

6   Q.   Before the detectives?

7   A.   I'm not sure, sir.

8   Q.   By the way, you didn't write a report about this incident,

9   did you?

10   A.   No, sir.

11   Q.   No one asked you to write a report?

12   A.   No, sir.

13   Q.   And you weren't required to write a report?

14   A.   No, sir.

15   Q.   And after you arrived were you asked to look for

16   something?

17   A.   Yes, sir.

18   Q.   You were asked to look for some sort of a bag, a shoulder

19   bag?

20   A.   Yes, sir.

21   Q.   And where did you go?

22   A.   At first I went to a car.

23   Q.   You went where?

24   A.   To a car, a motor vehicle.

25   Q.   A motor vehicle?  Who directed you to the car?  How did

1   you know what car to go to?

2   A.   Someone said it.  One of the officers said it.

3   Q.   Said what?

4   A.   Mentioned the motor vehicle; it was being driven by the

5   defendant.

6   Q.   And did you go by yourself or did you go with somebody

7   else?

8   A.   I believe I went with someone else.

9   Q.   Who did you go with?

10  A.   I don't remember, sir.

11  Q.   Would it refresh your memory if I told you that you went

12  with Officer Gamble?

13  A.   I would not remember at this point, sir.

14  Q.   If I went through the list of officers who were present,

15  would that help you at all?  You didn't go alone, in any event.

16  A.   I didn't, but I don't remember who it was.

17  Q.   And did you have the keys?

18  A.   No, sir.

19  Q.   Did the other officer have the keys?

20  A.   I'm not sure, sir.

21  Q.   Was the car open?

22  A.   It might have been.  I'm not sure.  I'm not sure.

23  Q.   When somebody told you to go to the car, did they point to

24  where the car was located?

25  A.   That is correct, sir.

1   Q.   And whoever it was, did they tell you what kind of car it

2   was?

3   A.   Yes, sir.

4   Q.   And did they say to you, Go to the car and search the car?

5   A.   They didn't tell me to do it.

6   Q.   Well, what did they say?

7   A.   They said, "We need to search the car."  The car was

8   parked in a parking lot.

9   Q.   So, you went to the car and they said to you, "We need to

10  search the car"?

11  A.   Yes, sir.

12  Q.   And you don't remember who said that to you?

13  A.   I don't remember, sir.

14  Q.   And you don't remember who was with you?

15  A.   No, sir.

16  Q.   And you don't remember who had the keys, if anyone?

17  A.   No, I don't remember, sir.

18  Q.   And you don't remember if the car was unlocked or locked?

19  A.   I don't remember.

20         MR. BOOKBINDER:  Your Honor, it's direct exam.

21         THE COURT:  Well, I am going to permit a little bit of

22  scope.

23  BY MR. FEINBERG:

24  Q.   When you got to the car, what did you do?

25  A.   I was looking for what we were looking for.

```
1    Q.   And where did you go?

2    A.   In the motor vehicle?

3    Q.   Yes.

4    A.   Went to the front, looked around.  That's what I did.

5    Q.   In the back?

6    A.   The back seat I did, too.

7    Q.   You did both?

8    A.   Yes.

9    Q.   Did you go to the trunk?

10   A.   No, I didn't.

11   Q.   Did you go inside the glove compartment?

12   A.   I didn't, I didn't.

13   Q.   When you say you didn't, do you remember whether or not

14   any other officer --

15   A.   No, I don't remember that.

16   Q.   Well, you don't remember whether or not the other officer

17   opened the trunk or opened the glove compartment?

18   A.   I don't remember, sir.

19   Q.   How long were you at the car?

20   A.   Five minutes, probably.

21   Q.   And did somebody else come over to the car at any point?

22   A.   Yes, sir.

23   Q.   Who?

24   A.   Detective Donofrio and Detective Hussey.

25   Q.   So, now there are four of you there, correct?
```

1    A.    Yes, sir.

2    Q.    One that you don't remember who it was, that went with you

3    at the beginning?

4    A.    Correct.

5    Q.    And then Officer Donofrio and Hussey arrived as well?

6    A.    Correct.

7    Q.    And then what did they do?  Do you remember seeing them at

8    the car?

9    A.    I know they were looking, sir, looking for something in

10   the car.  I don't know where in the car.

11   Q.    You don't know where?

12   A.    No, I don't.

13   Q.    Did they open the trunk?

14   A.    I don't remember that.

15   Q.    You don't remember?

16   A.    I don't remember, sir.

17   Q.    Do you remember whether they opened the glove compartment?

18   A.    Specifically, I don't remember them doing that, I don't.

19   Q.    And did you have a conversation with either Hussey or

20   Donofrio?

21   A.    Not with them.

22   Q.    Did you have a conversation with anybody up to and through

23   the point when the four of you were at the car?  Did you talk?

24   A.    No, sir.

25   Q.    You didn't talk at all?  You don't remember?

1    A.    I don't remember.  I don't remember, sir.

2    Q.    At some point did anyone else arrive at the car?

3    A.    I don't remember.

4    Q.    Did you finish searching the car?

5    A.    I did.

6    Q.    And then after you finished searching the car, what did

7    you do?

8    A.    I actually went around the parking lot looking for the

9    same bag that we were looking for, bushes.

10   Q.    What about the other officers, did they stay at the car?

11   A.    I don't remember, sir.

12   Q.    Do you remember anything else about what happened at the

13   car when you went to the car to search the car?

14   A.    I don't.

15   Q.    You had no conversation with Officer Hussey.

16   A.    No, sir.

17   Q.    You had no conversation or you don't remember the

18   conversation?

19   A.    I don't remember speaking to him -- to them.

20   Q.    Did you know Officer Hussey before that day?

21   A.    Yes, I did, sir.

22   Q.    He was a fellow officer that you have contact with?

23   A.    Yes, sir.

24   Q.    Same thing with Donofrio?

25   A.    Yes, sir.

1    Q.   And what about the other officer that you don't remember

2    the name of?  Was he somebody familiar to you, if you remember?

3    A.   I'm sure he was one of the officers at the scene.

4    Q.   Do you recall whether any one of them or yourself removed

5    anything from the car?

6    A.   I don't remember, sir.

7    Q.   Do you recall Officer Price coming over at any point?

8    A.   Yes, sir.

9    Q.   So, this is at a point in time when all four of you have

10   been searching the car, correct?

11   A.   That is correct.

12   Q.   And Officer Price comes over.

13   A.   Yes, sir.

14   Q.   And what happens when he comes over?

15   A.   He questioned whether the defendant had given consent to

16   search the car.

17   Q.   And what did you say?

18   A.   I say, "I overheard someone saying that there was

19   consent."

20   Q.   And what did he say to that?

21   A.   I don't recall what he said.  I don't remember.

22   Q.   You didn't say to him, No, there's been no consent?

23   A.   I don't remember saying that, sir.

24   Q.   Do you remember anybody else saying that?

25   A.   No, sir.

1    Q.    You said there was consent?

2    A.    I overheard someone saying there was consent.

3    Q.    Well, did you overhear a police officer saying, We've got

4    consent?

5    A.    That is correct.

6    Q.    And that's what you told Officer Price?

7    A.    That is correct.

8    Q.    Did he instruct you at that point to stop the search and

9    go back to where you were before?

10   A.    I don't remember, sir.

11   Q.    You would remember if he told you to stop and close the

12   door and stop the search, wouldn't you?

13   A.    I'm sorry.  Say that again.

14   Q.    Wouldn't you remember if Officer Price said to you, You

15   had better stop your search?

16   A.    I don't remember that part.

17   Q.    Your understanding was that when Price came over he asked

18   you if you had consent, you said you had heard that you did

19   have consent, correct?

20   A.    That's correct.

21   Q.    And then you continued to search?

22   A.    I don't remember continuing searching the car after the

23   fact.

24   Q.    Do you remember stopping the search?

25   A.    I probably was already done with it, I was done searching

1    when he mentioned it.

2    Q.    And then you started looking in trash cans and sort of

3    looking around?

4    A.    That is correct.

5    Q.    What did you see in the car?

6    A.    Nothing unusual.

7    Q.    Well, did you see papers?

8    A.    There might have been papers.  I don't remember seeing

9    papers.

10   Q.    Do you remember seeing a passport?

11   A.    No, sir.

12   Q.    Do you remember seeing a cell phone?

13   A.    No, sir.

14   Q.    Do you remember seeing a travel suitcase or a bag?

15   A.    No, sir.

16   Q.    Do you remember seeing any kind of a small cosmetic-type

17   kit?

18   A.    No, sir.  I don't remember.

19   Q.    Do you remember seeing a bottle of water?

20   A.    No, sir.

21   Q.    Nothing you can tell us about what you remember inside the

22   vehicle?

23   A.    No, sir.  My staying there was briefly.

24   Q.    I'm sorry?

25   A.    My staying in the car was briefly.

1    Q.   And then after you were searching around the general area

2    after the search of the car, what did you do then?

3    A.   I was called to respond to a different place for a

4    domestic dispute.

5    Q.   And you left?

6    A.   Yes, sir.

7    Q.   How long a period of time were you at the scene?

8    A.   10, 15 minutes.

9    Q.   Did you at any time see a detective there?

10   A.   Before I left I remember seeing Detective O'Connor.

11   Q.   Did you have a conversation with him?

12   A.   No, sir.

13   Q.   Did you give him a piece of paper?

14   A.   No, sir.

15   Q.   Any reason why you were just hesitating?  Are you just

16   trying to remember?

17   A.   I'm just trying to remember, sir, just trying to remember.

18   Q.   You don't remember giving him a piece of paper or you

19   didn't give him a piece of paper?

20   A.   I don't remember.

21   Q.   You just don't remember?

22   A.   I just don't remember.

23   Q.   You might have given him a piece of paper and you might

24   not have?

25   A.   I don't remember, sir.

1          MR. FEINBERG:  I have nothing further.  Thank you.

2          THE COURT:  Mr. Bookbinder.

3                         CROSS-EXAMINATION

4     BY MR. BOOKBINDER:

5     Q.   Officer Rivera, did you take anything from the car when

6     you searched it that day?

7     A.   I don't remember, sir.

8     Q.   You don't remember whether anyone else did?

9     A.   I think someone else did find something, but I don't

10    remember specifically.

11    Q.   Do you remember who that was --

12    A.   No, sir.

13    Q.   -- or what they found?

14    A.   No, sir.

15    Q.   You do remember a conversation with Officer Price about

16    consent?

17    A.   Yes, sir.

18    Q.   He came over and asked whether the defendant had

19    consented?

20    A.   That is correct.

21    Q.   And you said you had overheard another officer saying that

22    they had gotten consent?

23    A.   That is correct.

24    Q.   Do you remember Officer Price then saying that they ought

25    to be clarifying this consent?

1    A.   I don't remember him saying that, sir.

2    Q.   You don't remember what he did say after that discussion

3    about consent?

4    A.   No, sir.

5    Q.   But around that time the search of the car ended or had

6    already ended?

7    A.   Had already ended.

8    Q.   Did you close up the car then?

9    A.   I did, sir.

10   Q.   And you didn't search it again after that?

11   A.   No, sir.

12        MR. BOOKBINDER:  If I could just have a moment, your

13   Honor?

14        THE COURT:  Yes.

15                     (Pause)

16        MR. BOOKBINDER:  Nothing further from the Government.

17        THE COURT:  All right.

18                  REDIRECT EXAMINATION

19   BY MR. FEINBERG:

20   Q.   Officer, you say you think someone else took something out

21   of the car?

22   A.   Yes, sir.

23   Q.   What made you say that?

24   A.   I remember I overheard someone saying they had found

25   something that could potentially be something that we were

1    looking for.

2    Q.   What was it?

3    A.   I don't remember, sir.

4    Q.   Would it refresh your memory if I told you it was a piece

5    of paper?

6    A.   I don't remember, sir.

7           MR. FEINBERG:  Nothing further.

8           THE COURT:  All right.

9           Nothing?

10          MR. BOOKBINDER:  Nothing.

11          THE COURT:  All right.  You may step down, Officer

12   Rivera.

13          THE WITNESS:  Thank you.

14                  (Witness stepped down)

15          OFFICER BRIAN HUSSEY, DULY SWORN BY THE CLERK

16          THE CLERK:  Please state and spell your full name for

17   the record.

18          THE WITNESS:  Brian Hussey, H-U-S-S-E-Y.

19                  DIRECT EXAMINATION

20   BY MR. FEINBERG:

21   Q.   Good afternoon, Officer.  My name is Matthew Feinberg.  I

22   represent the defendant in this case.

23   A.   Good afternoon.

24   Q.   You are a detective?

25   A.   I am.

1   Q.   With the Cambridge Police Department?

2   A.   Yes.

3   Q.   And directing your attention to April 30th, did you go to

4   the Fresh Pond Mall at some point?

5   A.   Yes, I did.

6   Q.   When you arrived at the Fresh Pond Mall, who was there,

7   what other police officers were there?

8   A.   It was Officer Rivera, Officer Gamble, Officer Allen.

9   That's all I can remember.

10  Q.   Were there any other detectives there beside you?

11  A.   My partner, Detective Kevin Donofrio.

12  Q.   And what kind of detectives are you?

13  A.   We work in the Drug Unit.

14  Q.   And you arrived well before Detectives O'Connor, Atherton

15  and Flynn, am I correct?

16  A.   Yes.

17  Q.   Approximately what time would you say you arrived?

18  A.   It was right around 2:00.  I believe the call was given

19  out around 2:00.  We may have gotten there maybe five minutes

20  later.

21  Q.   And when you arrived did you see a scene of other police

22  officers?

23  A.   Yes.

24  Q.   Where were they?

25  A.   They were standing along the sidewalk area in front of the

1   stores.

2   Q.   And was there this gentleman (indicating), Mr. Pascu,

3   standing there?

4   A.   Yes.

5   Q.   And there were four or five other police officers in the

6   general vicinity?

7   A.   Yes.

8   Q.   At the time that you arrived did you have a conversation

9   with any of the police officers?

10  A.   I didn't.  I believe Detective Donofrio spoke with a

11  couple of them, yes.

12  Q.   And did you talk to Donofrio?

13  A.   I was seated right next to him in a vehicle.

14  Q.   Oh, you were in the car?

15  A.   Yes.

16  Q.   You never got out of the car when you went over to the

17  scene?

18  A.   Not initially, no.

19  Q.   Did somebody instruct you to do something at that point?

20  A.   I don't believe we were instructed to do anything.

21  Q.   Well, what was said to you?  What did you do then?  Strike

22  that.  At that point you had a conversation at the scene?

23  A.   Yes.

24  Q.   Do you remember who it was with?

25  A.   I do not.

1  Q.   And after that conversation did you go over to a car that

2  was parked in the parking lot?

3  A.   Yes.

4  Q.   And you were still in the car; you never got out of your

5  vehicle?

6  A.   When we got over to the car I saw Officer Rivera.  It was

7  at that point that I got out of our vehicle.

8  Q.   So, you drove over to where the defendant was, you had a

9  conversation, you never got out of the car and neither did your

10  partner, Detective Donofrio, correct?

11  A.   That's correct.

12  Q.   And you went directly from there to a car, a Chrysler.

13  A.   Yes.

14  Q.   And when you were at the Chrysler, Officer Rivera was

15  already there.

16  A.   That's correct.

17  Q.   Now, did you have a conversation with anybody?  That

18  conversation that you had, what was it?  Who talked to you

19  before you went over to the car?

20  A.   I didn't speak with anybody.  They said that -- it was

21  Detective Donofrio that was conversing with the other officers.

22  Basically they just said that Officer Rivera was over at the

23  motor vehicle.

24  Q.   Go help him?

25  A.   I think we just took it upon ourselves to go over there.

1   He was by himself, so we went over there to help him.

2   Q.   When you arrived at the car, were the doors open, that is

3   to say, swung open?

4   A.   The driver's side.

5   Q.   And was Officer Rivera in the car?

6   A.   He was standing outside of the vehicle, but he was leaning

7   inside of it, his upper body.

8   Q.   And at some point -- well, was the window open?

9   A.   The door was open, his body was outside, he was leaning

10  inside the vehicle.

11  Q.   I see.  And was the trunk open?

12  A.   Not at that point, no.

13  Q.   Well, at some point did you have anything to do with

14  opening the trunk?

15  A.   I didn't open the trunk, no.

16  Q.   Did Donofrio open the trunk?

17  A.   No.

18  Q.   At some point while you were at the car was the trunk

19  open?

20  A.   Yes.

21  Q.   Who opened it?

22  A.   I believe it was Officer Rivera.

23  Q.   And he went into the trunk or he looked in the trunk, to

24  your knowledge?

25  A.   Yes.

1    Q.    Did he look in the glove compartment?

2    A.    Not to my knowledge.

3    Q.    Did you?

4    A.    I did.

5    Q.    You looked in the glove compartment?

6    A.    I did.

7    Q.    And do you remember whether or not you took anything from

8    any part of the car?

9    A.    I looked at two separate pieces of paper that were in the

10   glove compartment, and after looking at them I placed them on

11   the front passenger seat.

12   Q.    And did you take them with you?

13   A.    No, I left them there.

14   Q.    You just left them out in plain view; is that the idea?

15   A.    On the passenger seat, yes.

16   Q.    Why did you do that?

17   A.    I left them there for Officer Rivera, if they wanted to

18   secure them as evidence or any further detective that showed

19   up, if they wanted to take control of them.

20   Q.    Did you tell Officer Rivera, I took a couple of pieces of

21   paper out of the glove box and put them on the seat in case you

22   need them?

23   A.    Yes, I did.

24   Q.    And what did he say?

25   A.    I think he just said, Okay.

1   Q.   Anything else that you examined or placed on the seat for

2   purposes of potential evidence?

3   A.   No.

4   Q.   Is Detective Donofrio your partner?

5   A.   Yes.

6   Q.   What about him?  Did he take anything, to your knowledge?

7   A.   I don't think he ever got out of our vehicle.

8   Q.   He never got out of the car?

9   A.   No.

10  Q.   Was he the driver or were you the driver?

11  A.   He was the driver.

12  Q.   And why didn't he get out of the car?

13  A.   I don't know.

14  Q.   At that point did you speak to anybody -- well, did you

15  speak to Officer Donofrio?

16  A.   When we left the area I did.

17  Q.   You mean you left altogether, not just the area of the

18  car?

19  A.   When we cleared the scene.

20  Q.   Cleared the scene?

21  A.   Yes.

22  Q.   How long were you at the car?

23  A.   I would say no more than 10 minutes.

24  Q.   Did you know what Officer Rivera was looking for?

25  A.   No.

1    Q.   All you were doing was helping him out?

2    A.   That's correct.

3    Q.   And you didn't know yourself what you were looking for, am

4    I correct?

5    A.   Correct.

6    Q.   But somehow the two pieces of paper seemed to be of some

7    significance to you; is that correct?

8    A.   Yes, you could say that.

9    Q.   And that's because they had addresses on them?

10   A.   Well, one of them was a parking ticket, one of them was a

11   piece of notebook paper with several addresses on it.

12   Q.   And the addresses were significant to you because you knew

13   that what was being investigated was a skimming operation?

14   A.   I knew that it potentially was, yes.

15   Q.   Are you aware of either yourself, your partner, Detective

16   Donofrio, Officer Rivera at any time picking up that piece of

17   paper with the addresses on it and giving it to Detective

18   O'Connor?

19   A.   Not to my knowledge, no.

20   Q.   Did you look in the trunk?

21   A.   I could see in the trunk when it was opened.  I didn't

22   search the trunk.

23   Q.   Did you see a suitcase in there?

24   A.   Yes.

25   Q.   Did you see a shoulder bag?

1    A.   I don't recall a shoulder bag.

2         MR. FEINBERG:  May I have a moment, your Honor?

3         THE COURT:  You may.

4                        (Pause)

5         MR. FEINBERG:  I have nothing else.  Thank you.

6         THE COURT:  All right.

7                    CROSS-EXAMINATION

8    BY MR. BOOKBINDER:

9    Q.   Detective Hussey, did you ask when you arrived at the car

10   that day whether the officers had obtained consent for the

11   search of the car?

12   A.   I did not, no.

13   Q.   Did anyone tell you whether they had?

14   A.   No.

15   Q.   Did you make any assumptions based on what was going on at

16   the car?

17        MR. FEINBERG:  Objection.

18        THE COURT:  Sustained.

19   BY MR. BOOKBINDER:

20   Q.   You are a narcotics detective; is that correct?

21   A.   Yes.

22   Q.   Fair to say that when you were searching that car you were

23   looking for contraband of any kind; that was the focus of your

24   search?

25   A.   That's correct.

1    Q.   And you didn't see anything that fell into that category,

2    correct?

3    A.   No.

4    Q.   You didn't see a laptop computer in the trunk of that car?

5    A.   I don't recall that, no.

6    Q.   When you finished the search you didn't take anything from

7    the car with you or give anything to any other officer, did

8    you?

9    A.   No.

10         MR. BOOKBINDER:  No further questions, your Honor.

11         THE COURT:  All right.

12         MR. FEINBERG:  I have nothing, your Honor.

13         THE COURT:  All right.  You may step down.  Thank you.

14         THE WITNESS:  Thank you, your Honor.

15             (Witness stepped down)

16         MR. FEINBERG:  That's the defendant's case.

17         THE COURT:  Anything else?

18         MR. BOOKBINDER:  Nothing from the Government, your

19    Honor.

20         THE COURT:  So, after consulting with Ms. Hancock, I

21    think it is likely that we will have a transcript by October

22    7th, that if the parties want to submit something further here

23    they can.  I would like that by October 21st, and we will set

24    it down for a hearing for argument on November 3rd at 3:00.

25         MR. FEINBERG:  May I just have a moment to check my

1    calendar?

2            THE COURT:  Sure, sure.

3            MR. FEINBERG:  A slight problem with the 3rd, Judge,

4    only in the sense that I have another case, a status, with a

5    Magistrate at 2:30.  I don't know.  It may last -- I may be a

6    few minutes late, that's all.  It's a big case, so there are a

7    lot of defendants.

8            THE COURT:  Let us hold it on the 3rd, and you will

9    show up when you can show up.

10           MR. FEINBERG:  I should be here by 3:00, but I just

11   don't know.

12           THE COURT:  All right.

13           MR. BOOKBINDER:  Thank you, your Honor.

14           THE COURT:  All right.  So, you will get to Mr. Lovett

15   the additional exhibits, and we will go from there.

16           MR. BOOKBINDER:  We should be able to get that CD I

17   expect this afternoon.

18           THE COURT:  We have got Exhibit 4, that photograph.

19           MR. FEINBERG:  Right here.

20           THE COURT:  All right.  Then, we will be in recess.

21   Thank you.

22           THE CLERK:  All rise.

23   (The Honorable Court exited the courtroom at 12:10 p.m.)

24   (WHEREUPON, the proceedings adjourned at 12:10 p.m.)

25

1           C E R T I F I C A T E

2

3

4           I, Brenda K. Hancock, RMR, CRR and Official Reporter

5   of the United States District Court, do hereby certify that the

6   foregoing transcript constitutes, to the best of my skill and

7   ability, a true and accurate transcription of my stenotype

8   notes taken in the matter of *United States of America v. Razvan*

9   *Pascu*, No. 1:11-cr-10199-DPW-1.

10

11

12

13

14

15   Date:October 7, 2011           /s/ *Brenda K. Hancock*

16                                  Brenda K. Hancock, RMR, CRR

17                                  Official Court Reporter

18

19

20

21

22

23

24

25