UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,
    Plaintiff,

v.

RAZVAN PASCU,
    Defendant

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CRIMINAL ACTION
No. 11-CR-10199-DPW

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO SUPPRESS

The Defendant, by and through counsel, submits this Memorandum in support of his Motion to Suppress Evidence from Search of a Motor Vehicle and Fruits Thereof.

In summary, Defendant asserts a) that his detention for over three hours was illegal; b) that the search of his car, and seizure of a list of addresses from within the car, was executed without consent or probable cause, and in the absence of exigent circumstances; c) and that the subsequent searches and inventory were the fruits of the initial illegal detention and unjustified search.

I.      **FACTS**

On April 30, 2011, at 2:00 p.m., a private person reported to the Cambridge Police Department dispatcher that a man wearing a brown vest, blue sweater, jeans and sunglasses was seen entering and exiting the Eastern Bank ATM vestibule at the Fresh Pond Mall. The man was "going in and out of the bank, removing his hood, putting his hood back on, removing his sunglasses and

putting the sunglasses back on each time he entered and exited the bank." (Tr. I: 7)[1] The person also identified a car that the man was seen entering, about 60-80 yards away from the Eastern Bank, and reported the man was carrying a satchel or shoulder bag. (Tr. I: 7-10.)  Officer Steve Allen responded and saw a man fitting the description he had been given by dispatch.  He was then approached by the private reporting person, who gave Allen the same information and pointed out the car, a gray Chrysler with New York plates. *Id*.  Allen, in a marked cruiser, saw a man who fit the description walking along the mall sidewalk.  He exited the cruiser and asked to speak to him.  The man, identified as the Defendant, was not wearing sunglasses or carrying a shoulder bag. (Tr. I: 13-14.)

Allen spoke English to the Defendant.  The Defendant responded in broken English with a heavy accent and using gestures.  Officer Allen also used gestures to communicate. (Tr. I: 66-68.)  Allen understood that the Defendant was waiting for a friend named Roberta, that he was from New York, and that he had a car.  The Defendant pointed to an area in the parking lot where the car was parked. (Tr. I: 16-18.)  Allen then asked for identification.  The Defendant produced a Romanian passport and another form of identification, which matched the Defendant's name and appearance. (Tr. I: 18.)

Within a few minutes, four additional uniformed officers in marked cruisers arrived:  Officers Rivera, Gamble, Marshall and Price. (Tr. I: 19, 61, 69.)  The Defendant, standing alone, was surrounded by five armed policemen and four marked police cruisers or wagons. (Tr. I: 70; Tr. II: 6)

---

[1] References are to the transcript of the hearing for Day I and Day II.

Officer Rivera was the last to arrive, and saw Allen, Marshall and Price standing with Defendant.  Allen reported his conversation with the Defendant to the other officers. (Tr. I: 19.)

In the presence of the other officers, Allen conducted a pat frisk of Defendant and read him his Miranda rights. (Tr. I: 24, 28, 70-71.)  Defendant's cell phone, car keys and hat were taken from him and put on the hood of one of the cruisers, where Allen had already put Defendant's passport and other identification. (Tr. I: 71-72.)  Defendant did not have sunglasses or a shoulder bag on him. (Tr. I: 74.)  Defendant was not free to leave the area, not only because he was surrounded by armed police officers, but also because his passport, identification card, car keys and cell phone had been taken from him. (Tr. I: 80-81.)[2]

Allen and Marshall told Rivera that the Defendant had been stopped for tampering with an ATM machine.  The officers began searching the area for the sunglasses and shoulder bag Defendant supposedly had on him. (Tr. I: 19-20, 78.)  One of the officers said, "We need to search the car", and told Rivera to search it. (Tr. II: 87.)  None of the other officers had asked the Defendant for permission or consent to search the car. (Tr. II: 13, 105.)  Either Allen or Rivera took the car keys from the hood of one of the cruisers.  Then Allen and Rivera went to Defendant's car to search it. (Tr. II: 12-14.)  They used the car key's remote to open the car,

---

[2]     Price testified a pat frisk occurred later, after the detectives had arrived, although he acknowledged that Defendant's passport and car keys had already been taken from him. (Tr. II: 29-33; 43-44.)  Given the earlier non-consensual search using Defendant's car keys, Allen's testimony that the pat frisk occurred much earlier is the more logical and consistent version, particularly since Allen recalled putting all of Defendant's belongings, including the car keys, on the hood of the cruiser. (Tr. I: 71-72.)

which was locked.[3] (Tr. I: 36, 84-85; Tr. II: 32.)  Other officers were searching the

parking lot for the sunglasses and shoulder bag. (Tr. I: 78-82.)

    While Rivera and Allen were searching in the car, Officers Hussey and

Donofrio arrived in their cruiser, got out and assisted in the search. (Tr. II: 88-92.)

Rivera opened the driver's door and searched the front seat area.  He also went

to the trunk, opened it and saw a suitcase inside. (Tr. II: 95-96, 101-102.)  Hussey

opened the front passenger side and then opened the glove compartment.  He

removed a parking ticket and a page from a notebook with several handwritten

addresses on it that had been inside the glove compartment.  He knew the

notebook paper with addresses would be significant in an ATM skimming

investigation.  Hussey told Rivera about the parking ticket and the notebook

page and said that this could be what they were looking for. (Tr. II: 95-96, 101-

102.)  Hussey turned both items over to Rivera to secure as evidence.  He then

left the scene. (Tr. II: 101-105.)  At about this time, Officer Price, who had stayed

with the Defendant, approached the searching officers and asked Rivera and

Allen if they had consent to search.  They said "no."  He told them to shut the

doors and leave. (Tr. II: 14-15.)  By then the search was well over. (Tr. II: 96.)[4]

---

[3]     This account represents the most logical synthesis of the evidence. To be
sure, the police witnesses were not in complete agreement and even contradicted
themselves. Thus, Rivera testified he went to the car with another officer, but
could not remember which officer accompanied him. (Tr. II: 86.) Price testified he
saw Rivera and Allen searching in the car without consent. (Tr. II: 12-14.) Hussey
testified that Rivera alone was conducting the search. II 100. Allen denied
searching the car, denied seeing anyone else take the car keys or search the car,
and testified he remained with the Defendant while all four other officers
searched for the bag and sunglasses. (Tr. I: 19-20, 29-30, 78.)

[4]     Here again, there is conflicting testimony. Price testified he saw only
Rivera and Allen searching when he approached. (Tr. II: 12.) Rivera testified that
four officers were searching when Price approached. (Tr. II: 88-92.) Although
Price said his inquiry as to consent was answered with an unequivocal "no",

One of the officers, probably Rivera, took the notebook page and parking ticket and returned to the area where Defendant was standing. (Tr. II: 95-96, 104-105.)  One of the officers also took the car keys, which had earlier been taken from the hood of the cruiser, and placed them back on the hood. (Tr. II: 16, 33.)

Price, Allen and Rivera returned to where Defendant stood.  Price asked the Defendant for permission to search the car.  Defendant's understanding was limited.  He answered "yes" without appreciating his right to say "no."  No one suggested he did not have to cooperate.  No one told him the car keys had already been used to open his car or that a search had already been conducted. (Tr. II: 35.)  No one told him the notebook page with the list of addresses had already been seized from the glove compartment. (Tr. II: 102-105.)

After Price asked consent, Allen took the keys back from the hood of the cruiser and together Price and Allen returned to the car to look for a shoulder bag.[5] (Tr. II: 16, 36-37.)  Allen saw three sheets of paper in plain view in the front seat area, but he did not take them because that was not what they were looking for. (Tr. I: 89-91; Ex.3.)  They did not find a shoulder bag, took nothing and returned to where the Defendant stood. (Tr. II: 16-17.)

Officer Price then asked if the detectives had been called.  When he learned they had not, he called them for assistance. (Tr. II: 17.)  About 20 minutes

Rivera testified he told Price he had overheard someone say they had consent. (Tr. II: 91-96.) Price said they should close the doors and leave, but Rivera testified he didn't remember Price telling him to stop or leave and that in any case they had finished the search when Price spoke to them. (Tr. II: 14-15, 89-96.) Rivera did remember that "someone else did find something". (Tr. II: 95.) Again, the account given above presents the most logical sequence.

[5]     Allen claimed Defendant voluntarily handed over the car keys after he asked permission to search. But Price entirely contradicts Allen's version, testifying he saw Allen take the keys from the hood of the cruiser. (Compare Tr. I: 35-6 with Tr. II 36-7.)

later, Cambridge Detective O'Connor, together with Detectives Flynn and Atherton, arrived on the scene. (Tr. II: 40.)  Before his arrival, Detective O'Connor, still at the police station, had heard the original dispatch and had queried the car registration, which had come back as valid and active. (Tr. II: 72.)

Upon his arrival, O'Connor was told that both the Defendant and the car had already been searched, and that officers had found a piece of notebook paper with handwritten addresses on it in the car. (Tr. II: 73-75.)  The piece of paper was turned over to O'Connor. (Tr. II: 47, 77.)  O'Connor went into the vestibule where he determined that the insert to the ATM appeared out of place. (Tr. II: 53-54.)  He then telephoned an Eastern Bank representative Barbara Minkwitz. (Tr. II: 54.)  O'Connor asked Ms. Minkwitz about locations of other Eastern Bank ATMs and ran the addresses on the notebook paper taken from the car by Ms. Minkwitz.  She confirmed that some of the addresses were Eastern Bank locations. (Tr. II: 54, 76.)  O'Connor also asked that surveillance photos of the ATM vestibule be e-mailed to him. (Tr. II: 55.)  He had his laptop with him and he could use it to access the surveillance photos. (Tr. II: 74.)

O'Connor then went outside with his laptop to determine whether the rest of the addresses on the piece of notebook paper were addresses of banks in the area with ATM machines.  He put the laptop on the trunk of the detectives' car and compared the notebook paper addresses with known ATM addresses in the financial district. (Tr. II: 75-76.)  He already knew that some of them were Eastern Bank ATM locations. (Tr. II: 54, 76.)  Officer Price, among others, was nearby as O'Connor did this.  Price saw O'Connor enter the addresses from the notebook paper into the laptop and understood that O'Connor was doing so because he

was investigating the use of skimming devices on ATM machines. (Tr. II: 20, 46-48.)

Once again, after the detectives arrived, Officer Allen requested Defendant's consent to search the car. (Tr. II: 19.)  He did so because they had not found what they were looking for and wanted to search again. (Tr. I: 101,105.)  No one told Defendant that the notebook paper had already been seized or that he had a right to refuse to allow the search.  Nor had he been told that two searches had already been conducted.

Allen and Price again went to the car.  Allen had the keys.  Price found three or four pieces of paper and a passport of another man (Moiceanu) in the glove compartment. (Tr. II: 45-46; Tr. I: 42.)[6]  The pieces of paper had handwritten addresses on them.  Price had just seen O'Connor with a similar piece of paper – the same size notebook paper with similar handwriting – and he knew they were important and should be brought to O'Connor's attention. (Tr. II: 47-48.)  Price took the pieces of notebook paper and the passport and turned them over to Detective Atherton who in turn gave them to Detective O'Connor. (Tr. II: 46, 75.)

Eventually, O'Connor received an initial batch of Eastern Bank surveillance photos on his laptop.  These photos did not match the Defendant, but did match the person in the passport seized from the car. (Tr. II: 60.)  Later, O'Connor requested and received a second set of surveillance photos.  These showed a man entering the vestibule, picking up a pamphlet and leaving the bank.  Based on the clothing, O'Connor identified this person as the Defendant.

---

[6]     Allen testified he was the one who found the papers and passport and that they were in plain view. (Tr. I: 42, 87-91.)

(Tr. II: 60-63.)  Sometime later, a Secret Service agent arrived who detected and removed a skimming device from the Eastern Bank ATM. (Tr. I: 43.)

Some three to four hours after he was stopped, the Defendant was handcuffed and brought to the Cambridge police station.  He had been standing in the mall the entire time. (Tr. I: 96.)  The car was towed from the mall parking lot to the tow yard.  An inventory search was conducted because the car had been ordered towed and taken into custody. (Tr. II: 63-64.)  A laptop computer was seized from the spare tire well in the trunk, as well as a GPS device and a cell phone from inside the car. (Tr. II: 66-67.)

The Defendant was booked at 7:54 p.m. (Tr. I: 97; Def. Ex. 2.)  The video of the booking process, as well as the later interview conducted by Officer DeSimone, demonstrates that Defendant, a Romanian citizen, had a limited understanding of English, and spoke with a heavy accent.  He sometimes understood what was being said to him and sometimes did not.  Officer DeSimone frequently spoke in Italian to make himself understood.  It appears that DeSimone's interview, in a combination of Italian and English, was conducted with considerable difficulty, with the Defendant frequently not understanding what was said to him. (Ex. _____, DeSimone interview.)

## II.   ARGUMENT

### A.   The detention of the Defendant at the Fresh Pond Mall amounted to an arrest in the absence of probable cause.

#### 1.   The detention of the Defendant at the Fresh Pond Mall exceeded the bounds of *Terry v. Ohio*.

8

In *Terry v. Ohio,* 392 U.S. 1 (1968), the Court authorized the brief stop of an individual suspected of imminent criminal activity and a frisk of his outer clothing to determine whether or not he carried a weapon.  To support such a brief detention of a suspect, the police must have a reasonable suspicion, based on "specific and articulable facts," that a crime is about to be committed. *Id.*, at 21.  The test is an objective one:

> [W]ould the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate? *Cf. Carroll v. United States,* 267 U.S. 132 (1925); *Beck v. Ohio*, 379 U.S. 89, 96-97 (1964).

*Terry, supra* at 22.

While the threshold is less than probable cause, the stop must nonetheless be justified on the basis of specific facts that give rise to reasonable suspicion.  A mere hunch or subjective good faith on the part of the police officers will not suffice:

> Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. *See, e.g., Beck v. Ohio, supra*; *Rios v. United States,* 364 U.S. 253 (1960); *Henry v. United States*, 361 U.S. 98 (1959).  And simple "'good faith on the part of the arresting officer is not enough.' ... If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Beck v. Ohio, supra*, at 97.

*Id*.

In this case, the initial information was provided by a civilian informant who stated merely that there was a man "going in and out of the bank, removing his hood, putting his hood back on, removing his sunglasses and putting the sunglasses back on each time he entered and exited the bank." (Tr. I: 7)  The man had a car and was carrying a shoulder bag. (Tr. I: 7-10.)  While the civilian may

have thought this was suspicious behavior, there is nothing in his observations to support an objective conclusion of reasonable suspicion. Going in and out of a bank, wearing sunglasses and a hood, and carrying a bag are all perfectly innocuous activities. It might be different if the Defendant had been observed tampering with an ATM machine, but that was not the case.

Nor did anything the police observed when they arrived on the scene contribute to a finding of reasonable suspicion. While the description of the Defendant matched what the civilian reported, that alone contributed nothing. The Defendant was completely cooperative and did not attempt to flee. He answered all the officer's questions to the best of his ability, given the language difficulty. Nor did the Defendant's nationality and difficulty with English count for anything in evaluating whether reasonable suspicion existed sufficient to detain the Defendant. Needless to say, if there was no reasonable suspicion, there could be no probable cause.

> **2.     The detention of the Defendant at the Fresh Pond Mall was tantamount to an arrest without probable cause.**

While "minimally intrusive interactions such as when police officers approach individuals on the street or in public places to ask questions" do not implicate the Fourth Amendment, *United States v. Ford,* 548 F. 3d 1, 4 (2008), a more intrusive encounter must be justified:

> If the encounter amounts to more than a minimally intrusive interaction, a seizure occurs, with a *de facto* arrest requiring probable cause or an investigative (or *Terry*) stop necessitating reasonable suspicion.

*Id*. An arrest, or Fourth Amendment seizure, is said to occur when, in view of all the circumstances surrounding the incident, a reasonable person would not have

believed that he was free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *United States v. Drayton*, 536 U.S. 194, 202 (2002). The First Circuit has held that, "To constitute a seizure ... ones' liberty must be restrained by either physical force or an assertion of authority." *United States v. Sealy*, 30 F. 3d 7, 9 (1st Cir. 1994) *Ford, supra.*

In this case, the Defendant was subjected to a *de facto* arrest shortly after his encounter with the police. Within minutes, the Defendant was confronted by five armed police officers who arrived in four police cruisers. When asked for identification, he produced his passport as well as other identification, which were taken. He was then frisked, and his car keys and cell phone were also taken. These items were held by the police throughout the encounter. Without his property, most importantly, his passport and car keys, the Defendant was clearly not free to leave. *See, Florida v. Royer*, 460 U.S. 491 (1983) (suspect not free to leave where police seized driver's license and airplane ticket and did not immediately return them). *Accord, Ford, supra* at 6.

The encounter in the Fresh Pond Mall parking lot lasted between three and four hours. This is far longer than a mere investigatory stop, which need be supported by only reasonable suspicion. While the Court has declined to adopt a rigid time limitation, three to four hours of detention without probable cause is far beyond what was reasonable. *See, United States v. Sharpe*, 470 U.S. 675 (1985). At no time was the officers' safety at risk, and at no time was the Defendant's identity in doubt. *Compare, United States v. Owens*, 167 F. 3d 739 (1st Cir. 1999) (50 minute stop upheld where police spent 20 minutes trying to ascertain whether motor vehicle driver had valid driver's license). The limited purposes of a

legitimate *Terry* stop, even if it had been justified, were achieved very early in the encounter.

Here the police embarked on a full-scale investigation, in the absence of any evidence that the Defendant had committed any crime, detaining the Defendant all the while. Accordingly, the fruits of this illegal detention must be suppressed.

**B.     The search of the Defendant's car and seizure of evidence therefrom at the Fresh Pond Mall, was executed without consent or probable cause, and in the absence of exigent circumstances.**

**1.     The initial search of the Defendant's car was without consent.**

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543 (1968). The only credible inference to be drawn from the evidence is that as a factual matter, there was no consent for the initial search of the Defendant's car. Upon stopping the Defendant and determining his identity, the police frisked him, removed his car keys, and searched his car without asking for or obtaining consent. Only in this way can one make sense of Officer Price's testimony, that upon approaching the car he asked Rivera and Allen if they had consent to search the car and they said "No." (Tr. II: 96.)

In the course of this initial unconsented-to search, Officer Hussey removed a piece of paper with addresses, later identified as the locations of ATM machines, from the glove compartment. Accordingly, this evidence must be suppressed.

2.      **The subsequent searches of the Defendant's car were also unjustified.**

a.      **Consent for the subsequent searches was involuntary under the totality of circumstances.**

In *Schneckloth v. Bustamonte*, 412 U.S. 218, 227-229 (1973), the Court held that the voluntariness of consent must be determined from the totality of circumstances:

> the question whether a consent to a search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent.
>
> ***
>
> In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.

An analysis of the surrounding circumstances here shows that the consent was invalid. First, the Defendant's native language is Romanian, and he had a very limited understanding of English. This is apparent from the videotape of the booking procedure. Although the Defendant and the police were able to communicate in simple ways, there is no evidence he understood the meaning of the words "consent" or "permission." Further, all the police witnesses agree that the Defendant was never told he had the right to refuse consent.

Additionally, such consent as there was, was tainted by the prior illegal search. It was apparent that the car had already been searched and that at least one piece of paper from the initial search had been brought back to the area where the Defendant stood. The cat was already out of the bag. The Defendant

acquiesced in the face of what must have unquestionably appeared to have been a *fait accompli.*  Consent in such circumstances cannot be said to have been voluntarily given. *See, United States v. Santa,* 236 F. 3d 662 (11th Cir. 2000); *Holloway v. Wolff,* 482 F. 2d 110 (8th Cir. 1973).

So too did the prior illegal detention vitiate voluntary consent.  By the time the police asked for consent, the Defendant had been in *de facto* custody without probable cause for a substantial period, surrounded by multiple armed police officers.  This factor weighs heavily against finding valid consent. *See, Alexander v. United States*, 390 F. 2d 101 (5th Cir. 1968) (consent to search following an illegal arrest is not voluntary.)

> **b.**     **Subsequent searches of the Defendant's car in the Fresh Pond Mall parking lot were fruit of the poisonous tree.**

Issues of consent aside, the subsequent searches of the Defendant's car were the fruit of the prior illegality, both as to the illegal detention without probable case and the prior unconsented-to search.

As a direct result of the Defendant's illegal detention and the unconsented-to search of his car, a piece of paper was removed from the glove compartment and turned over to Detective O'Connor.  O'Connor then used a computer to correlate the addresses on the paper with the locations of other ATM machines.  This information provided a basis for the further detention of the Defendant and the additional searches.  Under *Wong Sun v. United States,* 371 U.S. 371 (1963), and its progeny, the evidence derived from these additional searches is the tainted fruit of the initial unconsented-to search.  The fruit of the poisonous tree must also be suppressed.

C. **The evidence seized as a result of the search of the Defendant's car at the Cambridge Police Station was also the fruit of the poisonous tree and cannot be justified as an inventory search.**

    1. **The search of the Defendant's car was tainted by the primary illegality of the illegal detention and searches at the Fresh Pond Mall.**

Three to four hours after the Defendant was stopped and detained at the Fresh Pond Mall parking lot, a Secret Service Agent arrived and detected a skimming device in the Eastern Bank ATM. At this point, the Defendant was formally placed under arrest and taken to the Cambridge Police Station. His car was towed by the police to the Cambridge Police tow yard.

This arrest and seizure of the car were clearly the product of the lengthy investigation that the police undertook while illegally detaining the Defendant. Insofar as the police continued to search the car subsequent to the arrest, evidence seized as a result of that search must also be suppressed as fruit of the poisonous tree. *Wong Sun, supra.*

    2. **The Cambridge Police lacked the authority to tow the Defendant's car to the Cambridge Police Station.**

Typically, impoundment of a motor vehicle will be justified where it is illegally parked, or is in an unsafe location such as a public way, or is inoperable. *See, South Dakota v. Opperman*, 428 U.S. 364 (1976). None of these circumstances were present here. Impoundment may also be justified where the owner of a private lot asks the police to remove the vehicle. *United States v. Sifuentes*, 504 F. 2d 845 (4th Cir. 1974). Though the Mall parking lot is privately owned, there was

no evidence of such a request in this case.  There was no circumstance, exigent or otherwise, justifying seizure of car.

Rather, it appears the police simply seized the Defendant's vehicle on their own motion, as being somehow incident to his arrest.  But the arrest of an individual does not in itself justify a warrantless seizure of his property that is not on his person or under his immediate control. *Chimel v. California,* 395 U.S. 752 (1969); *Preston v. United States*, 376 U.S. 364 (1964).  Clearly, from the moment the car keys were seized from the Defendant during the initial pat down, some 60 to 80 yards away from the vehicle, and three to four hours prior to his formal arrest, the Defendant was not in control of the car.  The search and seizure of the vehicle cannot be justified as a search incident to arrest.

If the police were intent on seizing the vehicle and searching it for evidence, the constitutional method would have been to obtain a search warrant.

The vehicle having come into the possession of the police by illegal means, the search of the vehicle cannot be justified as an inventory search.  As the Court stated in *Opperman, supra* at 372, an inventory search is permissible for "automobiles impounded or otherwise in lawful police custody."  Here, the custody and impoundment were unlawful.  Accordingly, the items seized as a result of the inventory search must be suppressed.

### III.    CONCLUSION

Wherefore, for all the above reasons, the Defendant prays his Motion to

Suppress be allowed.


                                        RAZVAN PASCU,
                                        By his attorneys,


Date:  10/28/2011                        /s/ Matthew H. Feinberg
                                        Matthew H. Feinberg
                                        BBO #161380
                                        Matthew A. Kamholtz
                                        BBO #257290
                                        FEINBERG & KAMHOLTZ
                                        125 Summer Street, 6th Floor
                                        Boston, MA 02110
                                        (617) 526-0700


                        CERTIFICATE OF SERVICE

I hereby certify that I served a copy of Defendant's Motion through the
ECF system, which was sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and paper copies will be sent
to those indicated as non-registered participants.


Date:  10/28/2011                        /s/ Matthew H. Feinberg
                                        Matthew H. Feinberg